[Civ. No. 23427.   First Dist., Div. Four.   Apr. 24, 1967.]

PAUL R. THOMASSEN et al., Plaintiffs and Appellants, v. RAY CARR et al., Defendants and Respondents.

Robert S. Sturges for Plaintiffs and Appellants.

Samuels, Thoits, Lehman & Hanna, J. Ronald Hershberger and John E. Lehman for Defendants and Respondents.

DEVINE, P. J.—Appellants contend that the transaction which led to judgment against them was usurious. In this action plaintiffs and defendants ask determination of their rights and duties.

*Facts*

In 1961, the Thomassens, appellants, having much confidence in Hoyt Kelley, who was then their son-in-law, and who as a real estate speculator had made good deals for them, "left everything right in his hands," to quote Mr. Thomassen. Actually, Kelley was in poor financial condition. Later he became bankrupt. The Thomassens advanced $30,000 to Kelley. By a complicated series of transactions, Kelley bought a parcel of land on The Alameda in San Jose. The Thomassens did not realize that the lot was subject to a deed of trust to a Mrs. Mainero. Kelley devised a plan to have an office building constructed on the lot. He asked Mrs. Mainero to subordinate to a certain construction loan, but she refused. Kelley then made every effort for months to get construction money and finally was successful in getting a loan of $18,500 from the Carrs, respondents. The Mainero lien was paid off from the proceeds.

But Carr had agreed only after much negotiation. He did

not know about the Thomassens' interest in the transaction until it was almost completed. Kelley stated to Carr that the equity of the lot owners was $17,500. Because this was less than the amount proposed to be borrowed from the Carrs, Carr felt that there was a chance that they would have to take over the first mortgage, and even that their whole investment might be lost. He felt that since the Carrs would be putting up more than the landowners, they should get 30 percent participation in any profits. He anticipated a profit for the Carrs of from $16,500 to $21,500. Although there was to be provision for participation in rentals, Carr did not expect that there would be any division of rents because the whole plan was to have a quick sale of the building. Kelley was very confident that there would be no problem about selling. It was Carr's first experience with a development of this kind.

Carr was concerned that the loan might be usurious, so before making it he consulted counsel, who gave a written opinion that a plan substantially the same as that which was agreed upon would not violate the usury laws. The agreement recites that the lenders agree to lend to the borrowers the sum of $18,500 for an 18-month period "without interest" and to subordinate to a deed of trust not exceeding $75,000 to be used solely for construction purposes; that "in lieu of interest" the borrowers agree to pay a sum equal to 30 percent of the borrowers' net profit, if any, on the sale of the property; and that the term "net profit" shall be deemed to mean the total sales price of the property, less the sum of the following: (a) the land, valued at $35,000; (b) the actual cost of construction, including architects' and engineers' fees; (c) interest on the construction loan at not more than 6.5 percent per annum; (d) selling expenses, including advertising and promotion, and real estate commission; (e) real estate taxes for the period from the date of the loan until the sale of the property, or for 18 months, whichever period should be shorter; and (f) insurance for the same period as the taxes. The borrowers also agree to pay respondents 30 percent of the gross income, if any, from the rental of the property during the period between its completion and sale.

The agreement also recites that the borrowers will start construction on or before January 1, 1962; that the building will cost not less than $75,000 and be sold for not less than $150,000; that rentals shall be not less than 35 cents per square foot without the approval of the lenders; that in the event the borrowers fail to start construction by the agreed

date, the lenders may accelerate the loan and receive $600 in addition to the principal of the loan; and that if the building be not sold at the end of 18 months, either party shall have the option to obtain an appraisal, which will be deemed the sale price, but in that event no broker's commission or selling expense not incurred may be deducted in computing net profit.

Finally, the agreement also recites that the legal relationship between the parties is intended to be that of lender and borrower only.

A $60,000 bank loan for construction was obtained. The building was completed on September 4, 1962, and on January 1, 1963, it was leased at a monthly rental of $1,698.35. On February 10, 1963, the 18-month period expired. Payment was not made. Mr. Thomassen testified that because he had signed everything that was put before him by Kelley, he had no actual knowledge of the Carr transaction until demand for payment was made in August, 1964. But the agency of Kelley to act for the Thomassens is not disputed.

In accordance with the agreement, respondents selected Louis Cavala to appraise the property. His appraisal was $132,000. When demand was made upon appellants for payment, they replied by offering on September 1, 1964, to pay the sum of $25,383.27. This sum represented $18,500 plus interest at 10 percent, compounded annually from the date of the loan. There was no response to this offer.

The court found that the transaction was entered into in good faith without intent to evade the usury laws, and that the payment of legal interest was subject to one or more contingencies so that respondents' lawful profit was ''wholly placed in hazard.'' It found that the net profit, based on Cavala's appraisal, was $27,837.16, of which respondents would be entitled to 30 percent, or $8,351.15. It further found that the gross income from rental of the property between January 1, 1963, and March 31, 1965, amounted to $45,855.45, of which respondents would be entitled to 30 percent, or $13,756.77, less $2,548.55 already paid on account. The court also found that the principal of the loan had been in default from February 10, 1963, and that respondents were entitled to 10 percent interest thereon from that date, or $3,700. In accordance with these findings, the court gave judgment for respondents in the amount of $41,760.37, from which this appeal is taken. The court did not make any specific finding

regarding appellants' tender of September 1, 1964, although appellants requested the court to do so.

## The Interest Contingency Rule

The return to the Carrs under the judgment for the loan of $18,500 far exceeds the 10 percent maximum interest allowable (except to specified exempt classes, which include most of the major lending institutions) by law. (Cal. Const., art. XX, § 22.) Respondents rely on a rule of law which, they say, takes the case out of the proscription against usury. This rule is stated in Restatement of Contracts, section 527, as follows: ''A promise, made as the consideration for a loan or for extending the maturity of a pecuniary debt, to give the creditor a greater profit than the highest permissible rate of interest upon the occurrence of a condition, is not usurious if the repayment promised on failure of the condition to occur is materially less than the amount of the loan or debt with the highest permissible interest, unless a transaction is given this form as a colorable device to obtain a greater profit than is permissible. In that case it is usurious.'' The Restatement of Contracts gives as an illustration (p. 1026): ''A borrows from B $5000, payable in three years. It is provided in the bargain that instead of interest A shall pay B one-tenth of the profits of A's business. Although it is anticipated that this will exceed the amount of interest at the highest permissible rate, the bargain is not usurious in view of the contingency that the anticipation may not be realized.'' The same rule is recognized in substantially the same form in 55 Am.Jur., § 37, p. 351; 91 C.J.S., § 31, p. 609; 6 Williston on Contracts (rev.ed. 1938), § 1692, p. 4786; and as the law in California in 1 Witkin, Summary of California Law (7th ed., 1960), § 170, p. 185.

In *Lamb* v. *Herndon,* 97 Cal.App. 193, 201 [275 P. 503], the rule is stated thus: ''It is also a general principle that when payment of full legal interest is subject to a contingency so that the lender's profit is wholly or partially put in hazard the interest so contingently payable need not be limited to the legal rate, providing the parties are contracting in good faith and without the intent to avoid the statute against usury.'' It is similarly stated in *Jameson* v. *Warren,* 91 Cal.App. 590, 595 [267 P. 372]; *Miley Petroleum Corp., Ltd.* v. *Amerada Petroleum Corp.,* 18 Cal.App.2d 183, 189 [63 P.2d 1210]; *Schiff* v. *Pruitt,* 144 Cal.App.2d 493, 499 [301 P.2d 446]; *Wooton* v. *Coerber,* 213 Cal.App.2d 142 [28 Cal. Rptr. 635].

■ A distinction must be made in respect of the "hazard" to which the interest, or its substitute, is put: In order to justify the application of the rule stated in the authorities cited above, the hazard must be something over and above the risk which exists with all loans (whether the risk be great or small), that the borrower will be unable to pay. ■ On the face of the transaction in this case, it appears, as the trial court found, that the special hazard exists, because although by the terms of the promissory note the makers bind themselves unconditionally to repay the principal and interest at the end of 18 months, they are not obliged to pay interest for the first 18 months, but only to pay a share of the profit if there be any, and a share of rental if there be rental. The lenders' "profit" was not only subject, as in loans generally, to the risk of inability of the debtors to pay, but to extinction by eventualities in this single transaction even though the debtors were at all times solvent.

Appellants make several arguments against this conclusion. First, they propose that we declare that the interest contingency rule does not have standing in this state because of the constitutional provision against usury and because the rule as stated in the California cases cited above is either dictum or is diluted by such facts as the lender's being a quasi-partner or the presence of other considerations for the excess over allowable interest than the mere lending of the money. But it is unnecessary to set down an analysis of the several cases. They state the rule to be the law, whatever the particular factual situation in each of them may be. Besides, the rule is widely accepted, as shown by the texts cited above. Nor is the rule limited to cases in which the principal is repayable only on contingency, as appellants suggest. They cite authorities which surely do hold that contingency of repayment of principal may take a loan out of the usury proscription. (91 C.J.S., § 25, p. 599; 55 Am.Jur., § 32, p. 347.) But these same authorities, as shown above, state the rule where payment of interest only is contingent.

■ The interest contingency rule is subject to a principle which runs through all transactions which essentially are loans, that the courts will look to the substance rather than to the form and will condemn disguised usury. (*Jameson* v. *Warren,* 91 Cal.App. 590, 595 [267 P. 372]; *Abbot* v. *Stevens,* 133 Cal.App.2d 242, 248 [284 P.2d 159].)

■ But where a contract is not usurious as a matter of law, intent to violate the law is a necessary element and must

be proved affirmatively in order that usury may be found. (*Moore* v. *Dealy,* 117 Cal.App.2d 89, 94 [254 P.2d 888]; *Sandell, Inc.* v. *Bailey,* 212 Cal.App.2d 920, 934-935 [28 Cal.Rptr. 413].) The presumption is against the existence of usury. (*Sandell, Inc.* v. *Bailey, supra,* pp. 931-932; *Coley* v. *Wolcott,* 103 Cal.App. 140, 146 [284 P. 241].)

■ The presumption against usury is fortified by testimony of Carr that he regarded the loan as a highly risky transaction, that he felt there was a chance he might lose all of his investment, and that he thought the transaction would not be usurious. He consulted counsel in order to avoid usury. There was no attempt, as there frequently is in the cases where the parties attempt to conceal usury, to describe the transaction in terms other than those of a loan.

■ Appellants argue that the contingency of loss of the payment of interest was so remote that the transaction was usurious as a matter of law. There was ample evidence to justify the court's finding that the lenders' lawful profit (that is, an amount equal to the highest permissible amount of interest) was wholly placed in hazard. Mr. Cavala, the appraiser, testified that there is a gamble to such a transaction as this; that construction of an office building in San Jose was a somewhat speculative investment; that his appraisal was made after he had information as to the actual rental and that this was a factor in the appraisal, but that he has seen buildings empty for a long time; that normally the upper limit of value is the reproduction cost (which might have been considerably less than that based on income), but that in this case income more truly represented the value. Thus, the highly fortuitous element of the time and terms at which rental could be accomplished was a very important factor.

Appellants say that the transaction was so largely in control of the lenders that payment of interest as well as repayment of principal was a virtual certainty. They point to the fact that the agreement provided that the building could not be sold for less than $150,000 without the consent of the lenders, and that if the alternative of an appraisal were used the expense of real estate broker's commission would be eliminated. They point, too, to the 30 percent share of gross rentals. But the fixing of a minimum price of sale would be of no avail if no buyer were found. As it happened, none was found who would pay the minimum agreed price. Had the building not been rented and had the appraisal been according to the actual cost of the building, the profit would have

been substantially lower, if existent at all. There was no warranty against a generally depressed condition of the real estate market. Of importance in this respect is the fact that either party could call for an appraisal if the building were not sold at the end of 18 months. Thus, the lenders were subject to the hazard that a temporary recession in the market for this particular kind of building could deprive them of any return on the principal advanced by them. Moreover, the lenders were dependent on the actions of the promoter, Kelley. Carr testified that actually Kelley breached many of the provisions of the agreement. He changed the plans and he rented the building for less than the amount called for in the agreement. The control available to respondents was not as substantial as appellants would have it.

The fact that after the appraisal was made a profit was shown does not render the transaction usurious. (*Abbot* v. *Stevens*, 133 Cal.App.2d 242, 250 [284 P.2d 159].) Nor does the fact that the lenders expected a considerable profit show, as appellants argue it does, that a profit at least equal to the highest permissible interest was assured. What is hoped for in a rather risky transaction is high profit; but if great expectations were a guarantee of gain, losses and bankruptcies would be far less numerous than they are.

The court's conclusion that there was no usury is sustained.

### Default

Appellants argue that the court erred in declaring that default on the note occurred on February 10, 1963, and in awarding interest from that date, because respondents' share of profits could not be ascertained until the appraisal was completed on July 21, 1964. But the note became due on February 10, 1963, whether or not there were profits to be shared, and carried interest by its terms from that date. Appellants could have discharged the note and their liability for interest, which commenced on the due date, by paying it at that time. The amount due was certain. It did not depend on ascertaining if there were profits to be divided under the agreement.

### Tender

Appellants' next contention is that because their tender of $25,383.27 on September 1, 1964, was not answered, judgment for that amount and no more should have been rendered. They rely on Code of Civil Procedure section 2076, which provides, among other things, that the person to whom

a tender is made must, at the time of the tender, specify any objection he has to the amount of money tendered.

But the tender made here did not purport to comply with the terms of the agreement of the parties, for it is at wide variance from the rights and obligations of both parties. On the one hand, it contains no provision for respondents' sharing of profits and rents. On the other hand, the tender increases, in one respect, appellants' obligation in that it contains a proposal to repay the loan plus 10 percent from the date the loan was made. Both the agreement and the note provide for *no* interest for the first 18 months. Besides, if the transaction were usurious, there would be no liability to pay interest in any amount. (*Williams* v. *Reed,* 48 Cal.2d 57, 68 [307 P.2d 353].)

The purpose of section 2076 of the Code of Civil Procedure is to allow a debtor who is willing and able to pay his debt to know what his creditor will demand, so that he may, if he chooses, make his offer conform. (*Heimstadt* v. *Tapered Parts, Inc.,* 155 Cal.App.2d 711, 714 [318 P.2d 689].) Obviously, appellants were not seeking to know whether there were mere inexactitude or insufficiency in the amount they were offering. Appellants were not tendering an amount in compliance with the agreement and note, but were proposing a wholly different accommodation. This is not a true tender under section 2076. Moreover, respondents' attorney testified, without objection, that there were almost daily conversations between counsel at about the time of the "tender" and that he was sure that appellants' counsel was well aware of respondents' position that the appellants' demand was unrealistic and unsatisfactory.

Appellants mention that they requested specific findings and that the request was not acted upon, but they make a point in their brief of but two of these, which relate to the matter of tender. It is our conclusion, because of what has been said above about the nature of the offer made by appellants, that this offer could not, as a matter of law, constitute tender within the meaning of section 2076 of the Code of Civil Procedure.

Finally, we mention a point which was raised by this court during oral argument. The court asked counsel whether the date of appraisal should be considered the equivalent of the date of "sale," there having been no actual sale, so that the requirement of paying 30 percent of the rentals to respondents would terminate. Respondents, besides giving argument

on the subject, replied that the point was not made in the trial court and should not be considered now. We agree with this. We would be free to intervene if the meaning were clearly against respondents. But it is not. Indeed, on its face the agreement calls for sharing of rents until sale, and the paragraph which makes the appraisal value equivalent to sale price has to do with division of profits and not with rents. If there were any problem of interpretation on this subject, it was not before the trial judge.

Judgment affirmed.

Rattigan, J., and Christian, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 21, 1967.