[No. B191590. Second Dist., Div. Four. Aug. 23, 2007.]

WRI OPPORTUNITY LOANS II, LLC, Plaintiff and Respondent, v. RONALD I. COOPER et al., Defendants and Appellants.

528

Robert A. Lisnow and Randi R. Geffner for Defendants and Appellants.

Blue & Schoor and Charles D. Schoor for Plaintiff and Respondent.

OPINION

**MANELLA, J.**—Appellants Ronald I. Cooper and Ellen M. Cooper challenge summary judgment in favor of respondent WRI Opportunity Loans II, LLC (WRIO), in its action for payment of a loan guaranteed by appellants. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

There are no material disputes about the following facts: In 1999, the Coopers were the sole principals in Cooper Commons, LLC (CC), which planned to build residential townhouses and condominiums on a property in West Hollywood.[1] According to the budget for the project, the property was purchased for $5,979,066, and CC expected that the units, when completed, would sell for a total of $25,762,005. The senior and junior secured lenders on the project were, respectively, Comerica Bank—California (Comerica) and WRIO.

In November 1999, WRIO loaned $2,490,000 to CC. Under the loan documents, the loan matured in March 2002, and interest on the principal balance accrued at a rate equal to 2.0 percent above a reference rate set by the Bank of America (reference rate). The loan documents also contained provisions that accorded WRIO "additional interest." These provisions entitled WRIO to 4.0 percent of the gross sales price of each unit when it was sold to third parties not affiliated with CC; in addition, they awarded WRIO sums calculated according to a fixed schedule if other contingencies were to occur. By a written agreement, the Coopers personally guaranteed the performance of CC's obligations under the loan documents.

In June and December 2001, WRIO and CC amended the loan documents. The amendments increased the principal loan amount to $3,178,000, raised the interest rate to the greater of (i) 2.0 percent above the reference rate or (ii) 10.0 percent, and set the maturity date of the loan as June 12, 2002. In addition, the amendments increased the additional interest owed to WRIO upon sale of the units to nonaffiliated parties: WRIO's share of the gross sales price of the first 15 units to be sold was raised to 5.0 percent, and its share of the gross sales price of the remaining units was raised to 4.5 percent. The Coopers expressly approved these amendments, and agreed to guarantee CC's obligations, as amended.

On February 22, 2002, CC filed for bankruptcy under chapter 11, and subsequently stated in that proceeding that WRIO held a secured claim for

---

[1] CC initially intended to build 63 units, but later decided to build 62 units.

$3,178,000. No payment on WRIO's loan was made after the maturity date of June 12, 2002. In September 2002, the bankruptcy court authorized CC to obtain additional funding from Comerica to complete the construction of the project. The units in the project were completed and sold for a total of approximately $31.8 million. On March 2, 2005, WRIO demanded that the Coopers, as CC's guarantors, pay the amounts owed under the loan, but they did not respond.

On March 14, 2005, WRIO filed a complaint for breach of a written guaranty against the Coopers, and subsequently sought summary judgment, asserting that the Coopers were obliged to pay the principal and interest— including the so-called additional interest—that CC owed under the loan. When the Coopers opposed summary judgment on the ground that the loan was usurious, WRIO contended in its reply that the Coopers had waived a usury defense, and that the loan otherwise fell within an exemption to California usury law for shared appreciation loans (Civ. Code, § 1917 et seq.).[2] After the parties submitted additional briefing on the issues raised in WRIO's reply, the trial court granted summary judgment. On March 29, 2006, a judgment was entered awarding WRIO $6,634,300.82 plus additional accrued interest and costs.

## DISCUSSION

The Coopers contend the trial court erred in granting summary judgment. We agree.

### A.   Standard of Review

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) We thus apply " 'the same three-step process required of the trial court. [Citation.]' " (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662 [42 Cal.Rptr.2d 669].) The three steps are (1) identifying the issues framed by the complaint, (2) determining whether the moving party has made an adequate showing that negates the opponent's claim, and (3) determining whether the opposing party has raised a triable issue of fact. (*Ibid.*)

"[S]ummary judgment law in this state no longer requires a plaintiff moving for summary judgment to disprove any defense asserted by the

---

[2] All further statutory citations are to the Civil Code, unless otherwise indicated.

defendant as well as prove each element of his own cause of action. . . . All that the plaintiff need do is to 'prove[] each element of the cause of action.' [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Once the plaintiff makes an adequate initial showing, the burden shifts to the defendant to show a triable issue of fact "as to that cause of action or a defense thereto." (Code. Civ. Proc., § 437c, subd. (p)(1).)

Aside from challenging one item of interest valued at $19,014.45, the Coopers do not contend on appeal that WRIO failed to carry its initial burden on summary judgment. Their central contention is that there are triable issues as to their usury defense. Before the trial court, they pointed to WRIO's investment analysis for the loan, as originally made, which projected that the loan would earn $1,441,418 over its 23-month term—including $1,032,080 in so-called "additional interest"—resulting in an interest rate of 38 percent, which exceeds the rate permitted by California usury law. In this connection, they submitted evidence that the maximum interest rate allowable under the usury law during the applicable period was 11.5 percent. WRIO did not dispute the Coopers' factual showing regarding the loan's interest rate, but asserted that the provisions for additional interest in the loan rendered it a shared appreciation loan exempt from the usury law. The trial court agreed with WRIO.

In view of the Coopers' factual showing regarding usury, we conclude they raised triable issues regarding the existence of a usury defense unless—as the trial court determined—the defense fails as a matter of law. Because neither party submitted extrinsic evidence bearing on the meaning of the loan documents and the pertinent historical facts regarding the loan are undisputed, the interpretation of the loan's provisions and its status as a shared appreciation loan are questions of law that we resolve de novo. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839] [contract interpretation]; *Ghirardo v. Antoniolli* (1994) 8 Cal.4th 791, 800–801 [35 Cal.Rptr.2d 418, 883 P.2d 960] [application of usury law to undisputed facts].)[3] We therefore begin our inquiry by examining the applicable legal principles.

[3] In response to the trial court's request for supplemental briefing, the Coopers and WRIO submitted declarations from experts who offered conflicting opinions on the undisputed facts as to whether the loan is a shared appreciation loan. These declarations do not raise triable issues as to the proper characterization of the loan. Generally, Evidence Code section 805 permits expert testimony on the ultimate issue to be decided by the fact finder. However, this rule "does not . . . authorize an 'expert' to testify to legal conclusions in the guise of expert opinion. Such legal conclusions do not constitute substantial evidence. [Citation.]" (*Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841 [199 Cal.Rptr. 830]; see also *Elder v. Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 664 [136 Cal.Rptr. 203].) Thus, even lawyers may not testify as to legal conclusions, or " 'state interpretations of the law, whether it be of a statute, ordinance or safety regulation promulgated pursuant to a statute [citations].' " (*California Shoppers, Inc. v.*

## B. *Usury*

### 1. *Elements*

■ Generally, "[t]he California Constitution sets a maximum annual interest rate of seven percent on loans and forbearances, but allows parties by written contract to set the interest rate at up to 10 percent, or at the level of the Federal Reserve's discount rate plus 5 percent, on loans or forebearances involving real property. (Cal. Const., art. XV, § 1, subds. (1)–(2).)"[4] (*Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1534–1535 [5 Cal.Rptr.3d 835] (*Jones*).) To be usurious, a contract "must in its inception require a payment of usury"; subsequent events do not render a legal contract usurious. (*Sharp v. Mortgage Security Corp.* (1932) 215 Cal. 287, 290 [9 P.2d 819]; see *Strike v. Trans-West Discount Corp.* (1979) 92 Cal.App.3d 735, 745 [155 Cal.Rptr. 132].) The essential elements of a claim of usury are: "(1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction. [Citations.]" (*Ghirardo v. Antonioli, supra*, 8 Cal.4th at p. 798.)

As our Supreme Court has explained, "[t]he element of intent is narrow. '[T]he intent sufficient to support the judgment [of usury] does not require a conscious attempt, with knowledge of the law, to evade it. The conscious and voluntary taking of more than the legal rate of interest constitutes usury and the only intent necessary on the part of the lender is to take the amount of interest which he receives; if that amount is more than the law allows, the offense is complete.' [Citation.] Intent is relevant, however, in determining the true purpose of the transaction in question because '. . . the trier of fact must look to the substance of the transaction rather than to its form. . . . "[I]t is for the trier of the fact to determine whether the intent of the contracting parties was that disclosed by the form adopted, or whether such form was a mere sham and subterfuge to cover up a usurious transaction." ' [Citation.]" (*Ghirardo v. Antonioli, supra*, 8 Cal.4th at p. 798.)

### 2. *Interest Contingency Rule*

■ The usury law is subject to numerous exceptions and statutory exemptions. (*Southwest Concrete Products v. Gosh Construction Corp.* (1990)

*Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 67 [221 Cal.Rptr. 171]; see *Downer v. Bramet, supra*, 152 Cal.App.3d at p. 841.) As the court explained in *Downer v. Bramet*, at page 841: " 'The manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion. [Citation.]' "

[4] California's prohibition on usury is also set forth in an uncodified statute added by an initiative. (Stats. 1919, p. lxxxiii, reprinted at Deering's Ann. Uncod. Initiative Measures 1919-1 (1973 ed.) p. 35.)

51 Cal.3d 701, 705–706 [274 Cal.Rptr. 404, 798 P.2d 1247]; *Jones, supra*, 112 Cal.App.4th at pp. 1534–1535.) Because interest is usurious only when it is "absolutely repayable by the borrower" (*Ghirardo v. Antonioli, supra*, 8 Cal.4th at p. 798), California courts have long accepted a common law doctrine known as the "interest contingency rule." (*Thomassen v. Carr* (1967) 250 Cal.App.2d 341, 346–349 [58 Cal.Rptr. 297] (*Thomassen*); see *D-Beam Ltd. Partnership v. Roller Derby Skates* (9th Cir. 2004) 366 F.3d 972, 975.)

According to this rule, a loan that will " 'give the creditor a greater profit than the highest permissible rate of interest upon the occurrence of a condition . . . is not usurious if the repayment promised on failure of the condition to occur is materially less than the amount of the loan . . . with the highest permissible interest, unless a transaction is given this form as a colorable device to obtain a greater profit than is permissible." (*Thomassen, supra*, 250 Cal.App.2d at p. 346, quoting Rest., Contracts, § 527.) Thus, interest that exceeds the legal maximum is not usurious when its payment is "subject to a contingency so that the lender's profit is wholly or partially put in hazard," provided "the parties are contracting in good faith and without the intent to avoid the statute against usury." (*Lamb v. Herndon* (1929) 97 Cal.App. 193, 201 [275 P. 503].) Under the rule, the hazard in question must be "something over and above the risk which exists with all loans . . . that the borrower will be unable to pay." (*Thomassen, supra*, 250 Cal.App.2d at p. 347.)

Instructive applications of the rule are found in *Schiff v. Pruitt* (1956) 144 Cal.App.2d 493 [301 P.2d 446] (*Schiff*) and *Thomassen, supra*, 250 Cal.App.2d 341. In *Schiff*, a lender loaned $20,000 to a developer to enable the developer to build homes on lots in a tract. (*Id.* at p. 496.) The loan agreement obliged the developer to repay the principal with only nominal interest, but gave the lender the option to share the appreciation arising from the homes built and sold in the tract. (*Id.* at p. 498.) Under the agreement, the lender was entitled to purchase the sales contracts for the homes from the· developer—up to a maximum based on the face value of the contracts—by paying a sum equal to the costs that the developer had incurred in buying the underlying property and building the homes. (*Id.* at p. 496.) Because nothing ensured that the sales prices of the homes would exceed the price for the sales contracts fixed in the loan agreement, the court in *Schiff* concluded that the loan agreement was not usurious, reasoning that the lender's profit from the loan was contingent and "wholly at hazard." (*Id.* at pp. 498–499.)

In *Thomassen*, the lender agreed to loan $18,500 for an 18-month period to a developer to enable him to build an office building. (*Thomassen, supra*, 250 Cal.App.2d at pp. 343–344.) In lieu of a fixed rate of interest on the principal, the developer agreed to pay the lender 30 percent of the net profit from the

sale of the building and 30 percent of the building's gross income from rentals prior to its sale. (*Id.* at p. 344.) The Court of Appeal concluded that the loan was not usurious, pointing to the risks undertaken by the lender in connection with its profits under the loan. (*Id.* at pp. 346–349.)

Under the interest contingency rule, courts "look to the substance rather than to the form" of the transaction to determine whether the lender's profits are exposed to the requisite risk. (*Thomassen, supra,* 250 Cal.App.2d at p. 347.) In some cases, the absence of risk may be apparent on the face of the agreement. Thus, in *Maze v. Sycamore Homes, Inc.* (1964) 230 Cal.App.2d 746, 747–748 [41 Cal.Rptr. 338], the lenders loaned a developer $24,000 for a one-year period. Under the agreement, the developer was to repay the principal plus the sum of $4,800; these obligations were ostensibly secured by an assignment that granted the lenders the sum of $2,400 for each of 12 houses to be built by the developer, payable when the houses were sold. (*Ibid.*) Because the developer was unconditionally obliged to pay the sum of $28,800 notwithstanding the assignment, the lenders were guaranteed their profit "regardless of any profit or loss resulting from [the developer's] business or from the sale of the particular houses involved." (*Id.* at pp. 752–754.) Accordingly, the court in *Maze* concluded the interest contingency rule was inapplicable, and the loan was usurious. (*Id.* at pp. 753–754.)

Moreover, courts have looked beyond the face of the agreement to assess whether the lender's profits are subject to risk. In *Teichner v. Klassman* (1966) 240 Cal.App.2d 514, 516–518 [49 Cal.Rptr. 742], the lender entered into three agreements with a nightclub owner. Under the first agreement, the lender loaned $6,500, and was to receive the principal plus an option to buy an ownership share in the club; under the remaining agreements, the lender loaned $6,500, and was to receive monthly payments of $130 as long as the club was in existence. (*Ibid.*) Although there was a possibility that the club would be permanently closed due to changes in the law, the trial court declined to apply the interest contingency rule. (*Id.* at pp. 518–519, 522–523.) The Court of Appeal affirmed, reasoning that the lender's risk was not great enough to support the application of the rule. (*Id.* at pp. 522–523.)

### 3. *Shared Appreciation Loans*

Closely related to the interest contingency rule is the statutory exemption to the usury law for shared appreciation loans. (See *Jones, supra,* 112 Cal.App.4th at p. 1539.) Absent qualifications not relevant here, a shared appreciation loan within the scope of this exemption is "any loan made upon the security of an interest in real property which additionally obligates the borrower to pay . . . contingent deferred interest pursuant to the loan documentation," where " '[c]ontingent deferred interest' " is "the sum a

borrower is obligated to pay . . . as a share of (1) the appreciation in the value of the security property (2) rents and profits attributable to the subject property, or (3) both." (§ 1917.) In addition, the exemption requires any deed of trust that acts as security for the loan to "indicate on the document that [it] secures a shared appreciation loan." (§ 1917.004, subd. (b).) Section 1917.005 states: "Lenders shall be exempt from the usury provisions of Article XV of the California Constitution with respect to shared appreciation loan transactions. This section is declaratory of existing law."

In *Jones*, this court discussed the relationship between the exemption for shared appreciation loans and the interest contingency rule. There, a partnership obtained a loan for $1.7 million to purchase real property. (*Jones, supra,* 112 Cal.App.4th at p. 1532.) Under the terms of the loan, the partnership was obliged to repay the principal, together with 10 percent annual interest and "Excess Value Contingent Interest," that is, 50 percent of the appreciation in the value of the property upon resale or refinancing, within defined limits. (*Ibid.*) When a limited partner in the partnership brought an action against the bank, asserting the loan was usurious, the trial court sustained a demurrer to the partner's complaint without leave to amend. (*Id.* at pp. 1532–1533.) We affirmed on the ground that the loan fell within an exemption to the usury law for specified bank loans (Fin. Code, § 1504).

In so concluding, we rejected the partner's contention that the transaction constituted a " 'sham' " shared appreciation loan because the property's rapid appreciation ensured that "the lender's profits were never at risk." (*Jones, supra,* 112 Cal.App.4th at p. 1538.) Noting that the transaction "involve[d] a classic shared appreciation loan arrangement," we concluded that the lender's contingent interest was at risk because the lender could not force a sale or "lock in" its profits. (*Id.* at pp. 1534, 1538–1539.) Moreover, in discussing case authority on the interest contingency rule, we explained that when a loan meets the requirements for a statutory exemption to the usury law, courts will not look beyond those requirements to determine whether the underlying transaction exposes the lender's profits to significant risk or betrays an intent to evade the usury law. We stated: "The question of whether loaned money or interest [was] at risk figured into the determination of intent to evade the usury law, and the good faith shared appreciation loan was an early common law exception to the usury law. [Citation.] These cases do not apply to loans . . . covered by modern statutory exemptions that remove the need for evasion." (*Id.* at p. 1539.)

## C. *Additional Interest Provisions*

In view of *Jones*, the focus of our inquiry is whether WRIO's loan meets the statutory requirements for a shared appreciation loan. We therefore

examine its terms to determine the circumstances under which they accorded additional interest to WRIO. Because there is no extrinsic evidence bearing on these terms, we look at the plain language of the agreement, viewed as a whole. (*Eltinge & Graziadio Dev. Co. v. Childs* (1975) 49 Cal.App.3d 294, 297 [122 Cal.Rptr. 369].)

The loan agreement obliged CC to pay additional interest in connection with each proposed unit, payable upon the sale of the unit, "or in any event upon the Maturity Date."[5] The additional interest for each unit was calculated according to a schedule that contained provisions covering various contingencies. The schedule (as amended by the parties) assigned each unit a "Budgeted Gross Sales Price" falling in a range from $420,000 to $555,895, and addressed three key contingencies: (1) the unit, whether completed or under construction, was sold to a third party not affiliated with CC; (2) the unit, whether completed or under construction, was sold to an affiliate of CC or released due to payment of the loan; and (3) no construction of the unit had been undertaken when the loan matured or the underlying property was sold.[6]

In the case of the first contingency, WRIO was entitled to 5.0 percent of the gross sales price if the unit was among the first 15 sold, and 4.5 percent of the gross sales price otherwise. In the case of the second contingency, WRIO was entitled to the greater of (i) 4.5 percent of the actual gross sales price or (ii) 4.5 percent of the unit's budgeted gross sales price.[7] Finally, in

---

[5] Paragraph 1.6.4 of the loan agreement provides: "In addition to interest at the applicable rate, Borrower shall pay Lender additional interest (the 'Additional Interest') in connection with the release of Lender's security interest in each Unit comprising the Project. Borrower shall not take any action or make any omission that will result in a reduction of the number of Units to be constructed. The Additional Interest payable with respect to each Unit shall become due upon and shall be paid from the escrow established for the closing of the sale of such Unit, or in any event upon the Maturity Date, a full prepayment of the Loan, or a partial prepayment with respect to which a release of such Unit from the Deed of Trust is requested. Such Additional Interest shall be calculated in accordance with the Unit Schedule . . . ."

[6] The schedule also contains a provision concerning additional interest in connection with the sale of parking stalls and garage units.

[7] Regarding the first two contingencies, the schedule provides: "A.1 Units Completed or Under Construction. In the case of individual Units with respect to which construction has been commenced (whether or not the improvements are complete), Borrower shall pay Additional Interest in the following amounts: [¶] (a) For the first 15 Units being released in connection with the closing of a sale of such Units to bona fide third parties who are not an Affiliate of Borrower, 5.0% of the gross sales price of each Unit, including any and all lot premiums and buyer-choice options and upgrades; and [¶] (b) For the remaining Units, after 15 Units have closed, being released in connection with the closing of a sale of such Unit to a bona fide third party who is not an Affiliate of Borrower, 4.5% of the gross sales price of the Unit, including any and all lot premiums and buyer-choice options and upgrades; and [¶] (c) For any Unit being released in connection with a Loan prepayment, payment of the Loan at maturity or upon acceleration, or sale to an Affiliate of Borrower with Lender's consent, the greater of (i) 4.5% of the gross sales price of the Unit if such Unit is subject to a 'Qualifying

the case of the third contingency, WRIO was entitled to the difference between $1,376,290 and the sum of the additional interest WRIO received under the provisions for the other contingencies.[8] In effect, the provision regarding the third contingency is a "saving clause" that guaranteed WRIO additional interest even if no construction was undertaken on some or all of the units.

The schedule thus ensured WRIO a significant amount of additional interest in a wide range of circumstances, regardless of the success of the project. If CC undertook *no* construction on the project, the provision for the third contingency entitled WRIO to $1,376,290 in additional interest upon the loan's maturity date; if CC began construction but failed to complete the project, the provisions for the first and second contingencies entitled WRIO to at least 4.5 percent of the actual or budgeted gross sales price, depending upon whether the buyers of the partially completed units were affiliated with CC; finally, if CC completed the project as planned, the provision for the first contingency entitled WRIO to at least 4.5 percent of the total gross income from the sales of the units. It appears that the schedule denied additional interest to WRIO in only one circumstance of any consequence, namely, that CC began construction on the units and thereafter failed to sell them to anyone.

■ The remaining question is whether the schedule accords WRIO "contingent deferred interest" within the meaning of the statutory scheme governing shared appreciation loans. In resolving this issue of statutory interpretation, our objective "is to ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning. If those words are clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437 [35 Cal.Rptr.2d 155].)

In our view, the schedule cannot be construed as entitling WRIO to "contingent deferred interest," that is, "a share of (1) the appreciation in the

---

Sales Contract' . . . on the date of such prepayment, maturity, or acceleration, or (ii) 4.5% of the 'Budgeted Gross Sales Price' for such Unit based upon the plan type of the Unit as identified in the Plans, as follows . . . ."

[8] Regarding the third contingency, the schedule provides: "Property other than Condominium or Townhouse Units or Parking Units. Additional interest shall be due with respect to any portion of the Land that is not constructed as a condominium or townhouse Unit upon the sale of such Land or upon the Maturity Date in an amount equal to the difference between $1,376,290 and the sum of (i) the cumulative amount of Additional Interest that Lender has received prior to such time under [the other provisions for Additional Interest], plus (ii) the further amount of the Additional Interest that Lender expects to receive from closings of completed condominium or townhouse Units based on the budgeted sales prices shown in Section A.1 above."

value of the security property (2) rents and profits attributable to the subject property, or (3) both." (§ 1917, subd. (a).) The provisions in the schedule, on their face, guaranteed WRIO additional interest regardless of whether the underlying property appreciated in value, or whether the project generated rents or profits. If the property did not appreciate in value from its original purchase price of approximately $6,000,000—for example, because the project collapsed during a downturn in the real estate market, or resulted in defective or otherwise unmarketable units that required demolition—the schedule accorded WRIO additional interest ranging from 4.5 percent of the gross sales price of the property to $1,376,290. For the same reasons, if the property's appreciation was modest, the additional interest to which WRIO was entitled under the schedule could exceed the appreciation. Moreover, the schedule awarded WRIO $1,376,290 in additional interest even if *no* construction was undertaken on the project.

WRIO contends that additional interest pursuant to the schedule constitutes contingent deferred interest under the statutory scheme, even though the schedule ensures payments of additional interest in the absence of appreciation. WRIO argues that "a loan provision that requires a payment not based on appreciation or that requires payment even if there is no appreciation, does not preclude [the loan] from satisfying the statutory definition of a [s]hared [a]ppreciation [l]oan, as long as the borrower is obligated to pay the lender a share of the appreciation, if there is any appreciation, as it is in the present case." WRIO thus contends that the loan in question is a shared appreciation loan because the provisions awarding additional interest based on the actual gross sales price of the units effectively provided for the sharing of appreciation. For the reasons explained below, WRIO is mistaken.

As interpreted by WRIO, the statutory definition of a shared appreciation loan encompasses *any* loan secured by real property—including a loan that *guarantees* the lender an otherwise usurious rate of interest—as long as the loan *also* contains a provision entitling the lender to a share of appreciation arising from the property. WRIO's interpretation would effectively abrogate the usury law with respect to loans secured by real property by sanctioning usurious rates of interest that were guaranteed, even in the absence of appreciation or risk.

██ WRIO's construction cannot be reconciled with the language of the statutory scheme and the Legislature's evident purpose in enacting it. The provision exempting shared appreciation loans from the usury law states that the exemption "is declaratory of existing law." (§ 1917.005.) In view of this statement, the Legislature's apparent intent in creating the exemption was to clarify the application of the interest contingency rule in a defined set of

circumstances, rather than to abrogate the rule.[9] Under the rule, a lender may obtain payments on a loan that exceed the maximum interest rate set by the usury law, provided that these payments are subject to risk. (*Thomassen, supra,* 250 Cal.App.2d at pp. 346–349.) Accordingly, the statutory definition of a shared appreciation loan must be understood to permit a lender to obtain guaranteed interest payments up to the maximum rate permitted under the usury law, and *additionally*, payments of contingent deferred interest that are *subject to risk.*

■ As indicated above (see pt. B.2., *ante*), the interest contingency rule permits courts to look beyond the face of a transaction to determine whether the underlying transaction exposed the lender's ostensibly contingent profits to genuine risk; as we explained in *Jones*, the function of statutory exemptions generally is to curtail this kind of inquiry into the underlying transaction (*Jones, supra,* 112 Cal.App.4th at p. 1539). We therefore conclude that the Legislature's intent in enacting the exemption was to establish that if (1) a loan permits the lender to obtain payments over and above the maximum permitted by the usury law, and (2) the loan documents disclose on their face that these payments constitute a share of appreciation, rents, or profits in a secured property, the statutory exemption will apply.[10] Accordingly, we reject WRIO's contrary construction of the statutory scheme.

We also reject WRIO's contention that the loan terms awarding additional interest based up the actual gross sales price of the units are provisions for the sharing of appreciation under the statutory scheme. WRIO argues that the project, realistically viewed, was likely to cause substantial appreciation in the property's value, and the appreciation was likely to exceed the payments

---

[9] The provision containing this statement (§ 1917.005) is derived, in part, from an earlier statutory exemption for a narrowly defined class of shared appreciation loans (see former section 1917.167, added by Stats. 1982, ch. 466, § 12, pp. 1998–2006, repealed by Stats. 1987, ch. 652, § 1, pp. 2061–2062). The prior statutory scheme concerned loans to supply funds for the construction of "owner-occupied dwelling units," and permitted lenders to obtain up to 50 percent of the "Net appreciate[ion] value" of the units (that is, their "fair market value less the sum of the borrower's cost of the property and the value of capital improvements"). (Former §§ 1917.120, subds. (c), (f), (j), 1917.130, added by Stats. 1982, ch. 466, § 12, pp. 1998–2006, repealed by Stats. 1987, ch. 652, § 1, pp. 2061–2062). In view of the broad reach of the current exemption, we conclude the Legislature's statement that it "is declaratory of existing law" manifests an intent to refer beyond the prior statutory exemption to the common law interest contingency rule.

[10] We recognize that to the extent the statutory exemption obviates the need to look beyond the face of the transaction, it may be in tension with the Legislature's statement that the exemption "is declaratory of existing law" (§ 1917.005). However, such statements by the Legislature are properly assessed in light of other evidence bearing on the statute's meaning. (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244–245 [62 Cal.Rptr.2d 243, 933 P.2d 507].) Viewed in context, the statement manifests the Legislature's intent to preserve the central principles of the interest contingency rule.

to WRIO under the terms in question. WRIO thus contends that the terms effectively allocated WRIO a share of the appreciation.

■ We find this argument to be at odds with the legislative intent underlying the exemption. As we have explained, the statutory scheme authorizes an exception to the usury law founded on the interest contingency rule. Generally, exceptions to a statute are construed narrowly to cover only situations that are "within the words and reason of the exception." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 20 [22 Cal.Rptr.2d 229].) Under WRIO's proposal, loan terms that facially entitle the lender to a payment of interest above the legal rate not based on appreciation, rents, or profits, and which otherwise manifest an intent to avoid risks to such payment, constitute provisions for sharing appreciation under the statutory definition of contingent deferred interest. Because this proposal conflicts with the language of the statutory definition and the principles governing the interest contingency rule, we decline to adopt it. ■ In sum, WRIO's loan does not meet the statutory requirements for a shared appreciation loan, and thus the trial court erred in concluding the loan was exempt from the usury law on this basis.[11]

### D. *Waiver*

■ WRIO contends that summary judgment in its favor is properly affirmed on an alternative ground, namely, that the Coopers expressly waived their entitlement to assert a usury defense.[12] Pertinent to this contention are sections 2809 and 2810, which fall within title XIII of the Civil Code (§§ 2787–2856), which abolishes the distinction between sureties and guarantors (§ 2787), and otherwise defines their obligations and liabilities. Section 2809 states that a guarantor's obligation "must be neither larger in amount nor in other respects more burdensome than that of the principal."[13] Section 2810 further provides that a guarantor "is not liable if . . . there is no liability

---

[11] In view of this conclusion, it is unnecessary to address the Coopers' contention that the trust deed provided insufficient notice that it secured a shared appreciation loan.

[12] Although WRIO raised this contention in its reply to the Coopers' opposition to summary judgment and the parties addressed it in their supplementary briefing, the trial court did not rule on it in granting summary judgment. Nonetheless, absent a triable issue of material fact, we may affirm the grant of summary judgment "if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court. [Citations.]" (*Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [35 Cal.Rptr.2d 698].)

[13] Section 2809 provides in full: "The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation."

upon the part of the principal at the time of the execution of the contract . . . unless the [guarantor] has assumed liability with knowledge of the existence of the defense."[14]

Here, the written guaranty executed by the Coopers states: "Guarantor . . . waives any rights, claims, defense, abatements, or rights of setoff or recoupment based on or arising based on or arising out of: (1) any legal disability, discharge, or limitation of the liability of Borrower to Lender, whether consensual or arising by operation of law or any proceeding . . . ." Moreover, it states: "Guarantor affirms its intention to waive all benefits that might otherwise be available to Guarantor or Borrower under . . . Civil Code Sections 2809, 2810 . . . , among others." The Coopers do not dispute that the guaranty contains these provisions.

The issue thus presented is whether the Coopers' waiver encompassed their usury defense. In *Rochester Capital Leasing Corp. v. K & L Litho Corp.* (1970) 13 Cal.App.3d 697, 700–705 [91 Cal.Rptr. 827], the court concluded that an obligation to pay usurious interest undertaken by a corporation was unenforceable against the loan's guarantors, who were the corporation's principals. (See also *Martin v. Ajax Construction Co.* (1954) 124 Cal.App.2d 425, 431 [269 P.2d 132].) However, no published case has addressed whether the guarantors of a loan may expressly waive a usury defense. We therefore examine the legal authority applicable to this question.

The usurious provisions of a loan are void on the grounds of illegality or unlawfulness because they violate express provisions of law. (*Martin v. Ajax Construction Co., supra,* 124 Cal.App.2d at p. 431; see § 1667; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 455, pp. 497–498.) As Witkin explains, as a general rule, "[b]ecause an illegal contract is void, it cannot be ratified by any subsequent act, and no person can be estopped to deny its validity. [Citations.] [¶] Similarly, the defense of illegality cannot be waived by stipulation in the contract. [Citations.]" (1 Witkin, *supra,* Contracts, § 432, at pp. 473–474, italics omitted.)

---

[14] Section 2810 provides in full: "A surety is liable, notwithstanding any mere personal disability of the principal, though the disability be such as to make the contract void against the principal; but he is not liable if for any other reason there is no liability upon the part of the principal at the time of the execution of the contract, or the liability of the principal thereafter ceases, unless the surety has assumed liability with knowledge of the existence of the defense. Where the principal is not liable because of mere personal disability, recovery back by the creditor of any res which formed all or part of the consideration for the contract shall have the effect upon the liability of the surety which is attributed to the recovery back of such a res under the law of sales generally."

Thus, in *Hollywood State Bk. v. Wilde* (1945) 70 Cal.App.2d 103, 111–114 [160 P.2d 846], the court rejected the defendants' contention that a provision in their contracts to sell investments barred the plaintiff from introducing evidence that the contracts constituted illegal securities transactions. In so concluding, it relied on the rule that "[w]hen . . . the relations of the parties to a transaction are illegal and against public policy the court will deny relief based upon their contract," and remarked that under this rule, "a party may not 'by stipulation at the time of the execution thereof or afterward, waive his right to urge the illegality in any action thereon instituted by the other party thereto.' " (*Id.* at p. 112, quoting *American Nat. Bk. v. A. G. Sommerville* (1923) 191 Cal. 364, 371 [216 P. 376].) The court further stated: "The contracts being void by virtue of having been executed and assigned contrary to public policy and statute, all attempts to validate and vitalize them by inserting a waiver of such defense are likewise voidable for the same reason." (*Id.* at p. 114.)

In *Wells v. Comstock* (1956) 46 Cal.2d 528 [297 P.2d 961], our Supreme Court applied the rule barring the enforcement of illegal contracts to a transaction involving a guarantor. There, the plaintiffs had entered into an unlawful contract to sell corporate stock; the defendants were the buyer of the stock and a party who had agreed to guarantee the buyer's performance. (*Id.* at pp. 529–530.) In concluding that the defendant buyer was not estopped to assert that the contract was illegal due to his knowing participation in the illegal transaction, the court stated: " '[T]he rule of public policy that forbids an action for damages for breach of [an unlawful] agreement is not based on the impropriety of compelling the defendant to pay the damages. That in itself would generally be a desirable thing. When relief is denied it is because the plaintiff is a wrongdoer, and to such a person the law denies relief.' " (*Id.* at p. 532, quoting Rest., Contracts, § 598, com. a, p. 1110.)

The court in *Wells* further held that "[s]ince the principal obligation of the contract is unenforceable because of illegality, the guaranty too is unenforceable." (*Wells v. Comstock, supra,* 46 Cal.2d at p. 533.) As support for this conclusion, the court relied on section 2810 and section 117 of the Restatement of Security, which addresses the availability of the defense of illegality to a surety. The comment to section 117 states: "Where the principal's promise is itself illegal in its inception, and the performance of the surety's contract is subject to the laws of the same jurisdiction as that of the principal, it is against public policy to give legal effect to the surety's obligation." (Rest., Security, § 117, com. d, p. 313.)

In view of *Wells* and the other authority regarding rule against the enforcement of unlawful transactions, we conclude that the Coopers' waiver of their defenses arising under sections 2809 and 2810 or "by operation of law" was ineffective regarding their usury defense. WRIO nonetheless contends that the Legislature has authorized guarantors to waive a usury defense by enacting subdivision (a)(1) of section 2856 (subdivision (a)(1)), which provides: "(a) Any guarantor or other surety, including a guarantor of a note or other obligation secured by real property or an estate for years, may waive any or all of the following: [¶] (1) The guarantor or other surety's rights of subrogation, reimbursement, indemnification, and contribution and *any other rights and defenses that are or may become available to the guarantor or other surety by reason of Sections 2787 to 2855, inclusive.*"[15] (Italics added.)

Pointing to the italicized portion of subdivision (a)(1), WRIO argues that the Coopers' usury defense is "available to [them] by reason of" sections 2809 and 2810, and thus their waiver was effective regarding this defense. We disagree. As we have explained, the usury defense rests on the rule against the enforcement of illegal transactions, which is founded on considerations of public policy that are independent of sections 2809 and 2810. Furthermore, an examination of the history of section 2856 discloses that the Legislature did not intend subdivision (a)(1) to displace or modify this rule, insofar as it applies to the waiver of defenses by guarantors.

As originally enacted in 1995, Civil Code section 2856 was the Legislature's response to *Cathay Bank v. Lee* (1993) 14 Cal.App.4th 1533 [18 Cal.Rptr.2d 420] (*Cathay Bank*), which imposed stringent requirements on a guarantor's waiver of a defense arising from the principal's rights under the antideficiency statutes (Code Civ. Proc., §§ 580a, 580b, 580d, 726). (*River Bank America v. Diller* (1995) 38 Cal.App.4th 1400, 1417–1419 [45 Cal.Rptr.2d 790].) Generally, such defenses are not predicated on a contention that the principal's contract is unlawful. (See *ibid.*; *Cathay, supra,* 14 Cal.App.4th at pp. 1535–1542.)

---

[15] Subdivision (a) of section 2856 provides in full: "(a) Any guarantor or other surety, including a guarantor of a note or other obligation secured by real property or an estate for years, may waive any or all of the following: [¶] (1) The guarantor or other surety's rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the guarantor or other surety by reason of Sections 2787 to 2855, inclusive. [¶] (2) Any rights or defenses the guarantor or other surety may have in respect of his or her obligations as a guarantor or other surety by reason of any election of remedies by the creditor. [¶] (3) Any rights or defenses the guarantor or other surety may have because the principal's note or other obligation is secured by real property or an estate for years. These rights or defenses include, but are not limited to, any rights or defenses that are based upon, directly or indirectly, the application of Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure to the principal's note or other obligation."

Subdivision (a) of the 1995 statute provided in pertinent part: "Any guarantor, including a guarantor of an obligation secured by real property or any interest therein, may waive the guarantor's rights of subrogation and reimbursement and *any other rights and defenses available to the guarantor by reason of Sections 2787 to 2855, inclusive . . . .*" (Former Civ. Code, § 2856, added by Stats. 1994, ch. 1204, § 1, p. 7424, repealed by Stats. 1996, ch. 1013, § 2, pp. 5985–5987, italics added.) The remainder of the 1995 statute addressed the requirements for waivers, including waivers of rights and defenses arising from the antideficiency statutes. (*Ibid.*) In enacting the 1995 statute, the Legislature stated that subdivision (a) was "merely declarative of . . . existing law." (Stats. 1994, ch. 1204, § 2, p. 7424.) In 1996, the Legislature enacted the current version of section 2856, which amended the 1995 statute, but preserved the italicized language upon which WRIO relies. (Stats. 1996, ch. 1013, § 2, pp. 5985–5987.)

As the court explained in *River Bank America v. Diller, supra,* 38 Cal.App.4th at page 1419, the Legislature's declaration regarding subdivision (a) of the 1995 statute, viewed in context, manifested its intent to restore the law regarding waivers to its state prior to *Cathay Bank.* Because the portion of subdivision (a)(1) upon which WRIO relies is found in subdivision (a) of the 1995 statute, we conclude that it is not intended to abrogate or modify the rule against the enforcement of unlawful transactions, which antedates *Cathay Bank* and is not addressed in that case.[16] WRIO failed to establish a valid waiver of the Coopers' usury defense, and thus summary judgment cannot be affirmed on this ground.

E. *Conclusion*

Because WRIO's challenges to the Coopers' usury defense fail as a matter of law on the facts that were undisputed for the purpose of WRIO's motion for summary judgment, we cannot say there are no triable issues regarding that defense. Accordingly, summary judgment was improper.[17]

---

[16] We recognize that in enacting the current version of section 2856, the Legislature stated: "It is the intent of the Legislature that the types of waivers described in Section 2856 . . . do not violate the public policy of this state." (Stats. 1996, ch. 1013, § 3, p. 5987.) Because section 2856 does not describe the waiver of defenses based on the rule against the enforcement of unlawful transactions, and the history of the section manifests the Legislature's intent to preserve pre-*Cathay Bank* law, this statement cannot reasonably be viewed as evidence that the Legislature intended to abolish or limit the rule.

[17] In so concluding, we do not address the Coopers' contention that there are triable issues of fact regarding the item of interest valued at $19,014.45.

## DISPOSITION

The judgment is reversed. Appellants are awarded their costs.

Epstein, P. J., and Willhite, J., concurred.