Filed 8/29/13  Wallace v. Springall CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| GEOFFREY NOEL WALLACE, et al., | 2d Civil No. B244286 |
| Plaintiffs and Respondents, | (Super. Ct. No. 1371107) (Santa Barbara County) |
| v. | |
| PAM SPRINGALL, | |
| Defendant and Appellant. | |

Pam Springall appeals from a judgment entered in favor of Geoffrey Wallace, respondent, following a court trial.  The judgment awarded damages to respondent for appellant's breach of two contracts.  The first contract is a promise to pay for care-taking; property management and wages.  Appellant contends that respondent is barred from recovery because he was working as a general building contractor without the required contractors' license.  Respondent argues that he was not required to have a general building contractors' license because he was appellant's employee.  The second contract is an employment contract.  Appellant contends that the trial court erroneously awarded respondent damages for future economic loss resulting from the breach of this contract. Appellant maintains that respondent's employment was at will and could be terminated at any time without cause.  Respondent argues that appellant breached an implied-in-fact agreement that he could be discharged only for good cause.

We agree with respondent and affirm. Appellant has not demonstrated , as a matter of law, that the trial court's factual finding of an employer - employee relationship is erroneous. Similarly ,appellant has not demonstrated, as a matter of law, that the trial court's factual finding of a "good cause" for discharge is erroneous.

*Facts*

In her summary of the facts, appellant states that, because the trial court found her testimony to be " 'convoluted' " and " 'not credible,' " she has "elected to rely solely on the testimony of [respondent] and his witnesses." We do the same in our summary of the facts. The court found respondent to be "a very credible witness." It noted that his testimony was "consistent and believable" as well as "candid and frank in a 'blue-collar' manner."

Respondent met appellant in 1989 when he was doing electrical work at 100 Miramar Avenue in Montecito (the property), which consisted of a main house and four cottages. Two of the cottages were rented, and two were vacant. Appellant told respondent that her mother, Annabel Ballard, was the owner of the property. Appellant hired respondent to be the property's caretaker. As compensation for his services, she allowed him to live in one of the vacant cottages at a reduced rent. Respondent continuously worked as caretaker for approximately 20 years.

When appellant hired respondent, she was living in the main house on the property. A few months later, she moved to New Mexico. After her departure, the main house was not rented.

From time to time, respondent would do work that was additional to his caretaking duties. This additional work included "[p]lumbing repairs, tree work, tree cleanup work from storms, water damage repairs, some electrical repairs, [and] dry rot repairs . . . ." For this additional work, either appellant or her mother would reimburse respondent for the cost of materials and pay him for his labor. Respondent was a licensed electrical contractor. He was not a licensed general building contractor.

In 2004 respondent moved to Cottage D, a vacant cottage on the property. Before moving in, respondent spent about five months "fix[ing] it up." He paid for the labor and materials. Appellant later reimbursed him for some of the materials but not for the labor.

.2

In May 2008 appellant notified respondent and the other tenants that she was going to sell the property. All of the tenants except respondent moved out. Appellant paid respondent $50,000 for past labor and materials. Most of the payment was for the labor and materials he had provided for Cottage D.

In November 2008 appellant informed respondent that the property was not going to be sold. Appellant asked respondent to "fix up the cottages" so that she could get more rent. Appellant agreed to pay him "$500 a week, plus the cost of any labor or materials."

Respondent fixed up three cottages and, at appellant's request, advanced his own money to pay for the labor and materials. Appellant said that she did not have the money and promised to reimburse him at a later time. In January 2009 appellant said that her mother had died and that "she'd be squaring up with our account fairly soon."

At the same time that he was upgrading the cottages, respondent was operating an electrical contracting business and was doing "[s]ome small remodels and service work." The work on the cottages was "[t]otally different" from his electrical contracting work. The work on the cottages involved "painting, patching, a little bit of plumbing, a little bit of electrical, a little bit of everything."

It took six months to upgrade the three cottages. When the upgrading was completed, respondent rented the cottages. He deposited the rent checks in appellant's bank account.

In the spring of 2009, appellant informed respondent that she wanted to use the main house as a "high-end . . . vacation rental." Appellant said, " 'You're doing such a great job on the cottages, I want you to keep on going and fix up the big house, and it's going to end up turning . . . out to be a great deal for you because you've got a new job out of it.' " Appellant stated that respondent would take care of the vacation rental and receive 25 percent of the gross rent.

Appellant asked respondent how long he intended to stay on the property. Respondent said that he would like to "stick around" until his wife retired, which would probably be in about 15 years. Appellant replied: " 'That's fine.' . . . 'You can stay the rest of your life, if you like.' "

.3

In March 2009 respondent started upgrading the main house. He put in new wiring and new plumbing. He also did plaster repair work and replaced dry rot. He "revamped" all of the bathrooms. Respondent advanced his own money to pay for the improvements.

Appellant was respondent's "boss." She gave him directions as to what she wanted done in the main house. All of the work was approved in advance by appellant. Respondent consulted with her either weekly or biweekly. Once a month, he posted photographs on a web site so that she could follow the progress of the work.

To assist with the work on both the cottages and main house, respondent hired laborers. The laborers worked for appellant, who had "asked [respondent] to get people" for the job. Respondent hired and supervised the laborers as appellant's "project manager." Appellant's instructions were to "[j]ust get some workers and pay them cash. Least expensive, . . . the cheapest, but make sure they do a good job." She directed respondent to not obtain workers' compensation insurance and not send out 1099 forms. Respondent testified, "I was just following her orders, just like I'd done for 20 years." He charged appellant what it cost him to hire the laborers. He did not make a profit on their labor. He also charged appellant what it cost him to purchase the materials.

In December 2009 respondent traveled to appellant's home in New Mexico and met with her. He wanted to get something in writing about their arrangement. Respondent had "advanced nearly all of [his] retirement savings to pay for labor and materials to upgrade the property . . . ."

On December 23, 2009, appellant read to respondent two agreements that she had handwritten. Respondent did not read them because he "had a vision problem." The parties signed both agreements.

The first agreement was a promise to pay. It stated: "I [appellant] owe [respondent] $100,273 for materials and labor to date (12-23-09). He has estimated that it will cost $50,000.00 to finish the project. I have agreed to pay him an additional $125,000.00 for project management for a total of $275,273.00." Respondent considered the $125,000 to be his "wages" or "compensation."

The trial court referred to the second agreement as "an employment contract." It provided that respondent will receive 25 percent of the gross rent for the main house. Respondent "will manage the property and [do the] cleaning and gardening." For the gardening, appellant will pay him $250 per month. As rent for his cottage, respondent will pay appellant $1,200 per month.

When respondent signed the employment contract, he was not aware that appellant had added the following provision: "This agreement shall be in force unless terminated by either of the parties to it." Appellant had not read this provision to respondent. If respondent had known that the agreement included this provision, he would not have signed it. Respondent expected that the employment contract would continue "[p]robably 15 years or until [he] decided [he] didn't want to be there [on the property] or [he] died."

After signing the agreements, respondent returned to Montecito and continued working on the main house at his own expense. In June 2010 the upgrading of the main house was complete. "[I]t was ready to rent." That month appellant terminated the employment contract and served him with a three-day notice to pay rent or quit. Appellant did not inform respondent why she was discharging him. In a letter to respondent dated June 15, 2010, appellant's attorney assured respondent that appellant "intends to pay you what you are owed in accordance" with the promise to pay signed on December 23, 2009.

The three-day notice required respondent to pay $7,200, the unpaid rent for the previous six months at $1,200 per month. He had not paid the $7,200 because appellant had orally agreed that the rent would not be due until the end of the year. Respondent did not pay the $7,200 within the three-day period because he "didn't have any money left." He was evicted from the property.

Respondent spent all of his savings on upgrading the property. Appellant "wiped [him] out." She did not pay him the promised $275,273. Nor did she pay him 25 percent of the gross rent for the main house or $250 per month for gardening. Respondent testified, "[Appellant] had conned me into giving all my savings to fix her place up, and then just kicked me out when everything's done."

*Appellant's and Respondent's Complaints*

.5

In August 2010 respondent filed a complaint for damages. The operative first amended complaint consisted of seven causes of action, including two for breach of contract: one for breach of the employment contract (second cause of action), and the other for breach of the promise to pay (third cause of action). The complaint also alleged a cause of action for nonpayment of minimum wage (seventh cause of action). As an affirmative defense, appellant alleged that respondent "had no valid California's contractor's license, and so is prohibited from recovery for any services allegedly performed which require such license."

Appellant filed a complaint against respondent and his wife, Teresa Kistner. The operative fourth amended complaint consisted of eight causes of action. Appellant sought, inter alia, the return of $135,000 that she had paid respondent. The second cause of action was brought pursuant to Business and Professions Code section 7031, subdivision (b),[1] which provides: "[A] person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract."

*Statement of Decision*

After a seven and one-half day trial, the trial court filed a 33-page statement of decision. The court characterized the matter as "essentially a contract case wherein the termination clause [in the employment contract] should be ignored because [respondent's] signature was secured by [appellant's] inserting it into the agreement without his consent or knowledge."

The court found in favor of respondent on both his and appellant's complaints. It concluded that respondent was not required to have a general building contractor's license. The court stated: "The work was performed as a caretaker and property manager and not as a contractor; there is, additionally, the employee exemption; a residential project manager is not required to be licensed." "[Respondent] was [appellant's] employee for 20 years."

For breach of the employment contract (second cause of action), the court awarded respondent damages of $15,000 for past economic loss and $60,000 for future economic

---

[1] All statutory references are to the Business and Professions Code unless otherwise stated.

.6

loss. For breach of the promise to pay (third cause of action), the court awarded respondent damages of $210,000. For nonpayment of minimum wage (seventh cause of action), the court awarded respondent damages of $3,000.

*Contractors' License Law*

"The Contractors['] License Law, section 7000 et seq., establishes a comprehensive scheme to ensure the licensing of all California contractors and the enforcement of complaints against unlicensed contractors. (*G. E. Hetrick & Associates, Inc. v. Summit Construction & Maintenance Co.* (1992) 11 Cal.App.4th 318, 327.) "Section 7031 provides that anyone who engages in the business of, or acts in the capacity of, a contractor without possessing a valid contractors' license, if one is required by law, is barred from maintaining an action to collect compensation . . . [Citations.]" (*Fillmore v. Irvine* (1983) 146 Cal.App.3d 649, 655.) "Regardless of the equities, section 7031 bars all actions, however they are characterized, which effectively seek 'compensation' for illegal unlicensed contract work. [Citation.] Thus, an unlicensed contractor cannot recover either for the agreed contract price or for the reasonable value of labor and materials. [CitationS.] The statutory prohibition operates even where the person for whom the work was performed knew the contractor was unlicensed. [Citations.]" (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 997.)

There is a statutory "employee" exception to the Contractors' License Law. The bar of section 7031 "does not apply to any person who engages in . . . activities . . . as an employee who receives wages as his or her sole compensation, does not customarily engage in an independently established business, and does not have the right to control or discretion as to the manner of performance so as to determine the final results of the work performed." (§ 7053.)

It is undisputed that, in upgrading the cottages and main house, respondent performed work for which a general building contractors' license was required. But respondent possessed only an electrical contractors' license. Thus, respondent's "right to maintain this action [for compensation for nonelectrical work] is dependent upon his being characterized

.7

as an employee rather than an independent contractor."  (*Fillmore v. Irvine*, *supra*, 146 Cal.App.3d at p. 655.)

*Standard of Review*

"The distinction between an employee and a contractor is an old one . . . .  It is well settled that ordinarily the question in each case is one of fact, and that therefore, as in other cases involving fact questions, the decision of the trial court will be affirmed if supported by any substantial evidence.  '[I]n the last analysis each case must turn upon its own peculiar facts and circumstances.' [Citations.]"  (*Rodoni v. Harbor Engineers* (1961) 191 Cal.App.2d 560, 562; see also *Jackson v. Pancake* (1968) 266 Cal.App.2d 307, 311 ["It has been repeatedly stated that whether one is acting as a contractor or not is usually a question of fact"].)  But " ' "if from all the facts only a single inference and one conclusion may be drawn, whether one be an employee or an independent contractor is a question of law." ' "  (*Rodoni v. Harbor Engineers*, *supra*, 191 Cal.App.2d at p. 562.)

Pursuant to the substantial evidence rule, " 'the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below.  [Citation.]  We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .  [Citations.]"  (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660; see also *Malvich v. Rockwell* (1949) 91 Cal.App.2d 463, 468 ["Where there is substantial evidence to support the finding that a relationship of employer and employee . . . existed . . . , that determination is controlling on appeal even though there may be evidence of elements which would have reasonably supported a contrary decision"].)  " 'Substantial evidence is evidence that is "reasonable, credible, and of solid value;" such that a reasonable trier of fact could make such findings. [Citation.]' "  (*WorldMark v. Wyndham Resort Development Corp.* (2010) 187 Cal.App.4th 1017, 1029.)

*Substantial Evidence Supports the Trial Court's*<br>*Finding that Respondent Was an Employee, Not a Contractor*

Appellant contends that respondent failed to satisfy the three prongs of the employee exception to the Contractors' License Law. The three prongs are that the employee (1) "receives wages as his or her sole compensation," (2) "does not customarily engage in an independently established business," and (3) does not have the right to control or exercise discretion "as to the manner of performance so as to determine the final results of the work performed." (§ 7053.) The Contractors' License Law does not define "wages." Labor Code section 200 defines "wages" as including "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."

Substantial evidence supports the first prong that respondent received wages as his sole compensation. Respondent testified that he had charged appellant only what it cost him for labor and materials. He did not make a profit. He received wages from appellant for his own work. For example, for fixing up the three cottages, appellant agreed to pay respondent "$500 a week, plus the cost of any labor or materials." The $500 per week were respondent's wages. The promise to pay signed on December 23, 2009, included payment to respondent of $125,000 "for project management." Respondent considered the $125,000 to be his "wages."

Substantial evidence also supports the second prong that respondent did "not *customarily* engage in an independently established business." (§ 7053, italics added.) The key word is "customarily." Respondent operated an independently established electrical contracting business. But a reasonable trier of fact could conclude that respondent did not *customarily* engage in that business while working on the cottages and the main house. Respondent's work for appellant clearly predominated over his outside jobs. Respondent testified that, from November 2008 through June 2010, he had worked a total of 3,535 hours for appellant. Thus, during this 20-month period, he averaged approximately 177 hours of work for appellant per month, more than 40 hours per week.

Finally, substantial evidence supports the third prong that respondent did not have the right to control or exercise discretion over the work "so as to determine the final results of the work performed." (§ 7053.) According to respondent, appellant was his "boss." She

.9

gave him directions on what she wanted done in the main house. She approved all of the work in advance, and respondent consulted with her either weekly or biweekly. Respondent testified, "I was just following her orders, just like I'd done for 20 years."

In determining whether a person is an employee or a contractor for purposes of the Contractors' License Law, the trier of fact may consider factors other than those specified in section 7053. These other factors include "the duration and conditions of employment, . . . and whether or not the parties believed they were creating a relationship of employer and employee." (*Malvich v. Rockwell*, *supra*, 91 Cal.App.2d at p. 468.) These factors favor the establishment of an employer-employee relationship. Respondent worked continuously for appellant for 20 years. He did not work only on particular projects. Respondent believed that he was appellant's employee. He testified that he had "hired [laborers] for [appellant] as her project manager."

It is reasonable to infer that appellant likewise believed that respondent was her employee. She directed respondent to not obtain workers' compensation insurance and not send out 1099 forms. No reasonable person who hired an independent contractor would interfere with the conduct of the contractor's business in this manner. Moreover, appellant believed that she had the right to discharge respondent without cause at any time, and she purported to exercise this right in June 2010.[2] "The right to discharge an employee at will, without cause, is strong evidence of the employer's control" and, therefore, also strong evidence that the person discharged was an employee rather than an independent contractor. (*City of Los Angeles v. Vaughn* (1961) 55 Cal.2d 198, 201.)

*Trial Court's Alleged Reliance on Inadmissible Expert Opinions*

Appellant contends that "if the court relied on 'experts' for their determination as to whether [respondent] was an employee, instead of the court itself applying the pertinent law --- Bus. & Prof.C. § 7053 --- to the facts, then the court has erred in the most fundamental way[.]" Appellant is referring to the testimony of two expert witnesses. The first expert opined that, in the Santa Barbara-Montecito area, "on-site" residential property managers or

---

[2] As we discuss below in the section entitled "*Breach of Employment Contract: Damages for Future Economic Loss*," appellant in fact did not have the right to terminate the employment contract without cause.

.10

caretakers are considered to be employees and are not required to have a contractors' license to perform their duties. The second expert opined that, if a residential property manager or caretaker in the Santa Barbara-Montecito area is "living on site in exchange for services, [he is] typically going to be perceived as an employee."

In his opening brief, appellant argues that the experts' opinions were inadmissible because they were actually " 'legal conclusions in the guise of expert opinion.' " (Quoting from *WRI Opportunity Loans II LLC v. Cooper* (2007) 154 Cal.App.4th 525, 532, fn. 3; see also *Williams v. Coombs* (1986) 179 Cal.App.3d 626, 638, disapproved on another ground in *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 885-886 ["the 'opinion of a witness on a question of law is obviously incompetent' "].) The argument is forfeited because appellant failed to object on this ground in the trial court. (*SCI Cal. Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563-565.) Appellant did not object to the testimony of the first expert. Appellant objected to the testimony of the second expert on the ground that "[t]his expert has not been qualified to give that opinion," not on the ground that the opinion was an inadmissible legal conclusion.

Furthermore, the argument is forfeited because it is conclusory without meaningful legal analysis and without a showing that the error resulted in a miscarriage of justice. (See *Golden Drugs Co., Inc. v. Maxwell-Jolly* (2009) 179 Cal.App.4th 1455, 1468 [appellant "presents no legal analysis demonstrating reversible error on this point, and therefore the matter is forfeited"]; *Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 772-773 ["An appellant bears the burden to show not only that the trial court erred, but also that the error was prejudicial in that it resulted in a miscarriage of justice," which " ' "should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" ' "].)

In any event, the expert opinions were not improper legal conclusions. The experts did not testify that respondent was an employee within the meaning of section 7053. They

.11

testified that, in the Montecito-Santa Barbara area, a residential property manager or caretaker who lives on-site is considered to be an employee.

*Breach of Employment Contract:*

*Damages for Future Economic Loss*

The employment contract contains a provision stating that it is terminable at will. Appellant does not contest the trial court's finding that this provision is inapplicable because she inserted it without respondent's knowledge. But appellant argues that "elimination of the termination clause has no effect because, under California law, [the employment contract] was at-will in any event." Thus, appellant contends that the trial court erroneously awarded respondent damages of $60,000 for future economic loss. (See *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 635 [" 'where the at-will employment relationship is terminated, the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance"].)

In his complaint, respondent alleged that appellant had breached an implied agreement that the employment contract would be terminated only for good cause: "It was implied by the 20 plus year relationship between the parties and the facts and circumstances surrounding the agreements that the Employment Agreement would not be terminated unless good cause existed for such termination. No good cause existed for [appellant's] termination of [respondent]." The trial court impliedly found that appellant had breached this implied agreement.

"Labor Code section 2922 establishes a statutory presumption of at-will employment. However, an employer and an employee are free to depart from the statutory presumption and specify that the employee will be terminated only for good cause, either by an express, or an implied, contractual agreement. [Citation.]" (*Stillwell v. Salvation Army* (2008) 167 Cal.App.4th 360, 380.) An implied-in-fact contract to discharge only for good cause arises "from the parties' *conduct* evidencing their actual mutual intent to create such [an] enforceable limitation[]. [Citation.]" (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 336.) " 'Generally, the existence of an implied-in-fact contract requiring good cause for

.12

termination is a question for the trier of fact . . . .'  [Citation.]"  (*Stillwell v. Salvation Army*, *supra*, 167 Cal.App.4th at p. 380.)  The trier of fact may consider " ' "the employee's longevity of service [and] actions or communications by the employer reflecting assurances of continued employment." ' "  (*Guz v. Bechtel Nat. Inc.*, *supra*, 24 Cal.4th at pp. 336-337.)

Substantial evidence supports the trial court's implied finding that the parties intended that the employment contract could be terminated only for good cause. Respondent continuously worked for appellant for 20 years, and appellant gave him assurances of continued employment.  In the spring of 2009, before the employment contract was signed, respondent told appellant that he would like to "stick around" until his wife retired, which would probably be in about 15 years.  Appellant replied, " 'You can stay the rest of your life, if you like.' "

Appellant contends that respondent cannot recover on the employment contract because a condition precedent to his contractual rights was that the main house be "actually rented out," and the house was not "even ready to be advertised for rental until August, 2010 -- nearly two months after [respondent] had been terminated."  But it is of no consequence that the condition precedent occurred after respondent's termination.

Accordingly, the trial court did not err in awarding respondent damages for future economic loss resulting from the breach of the implied-in-fact agreement to discharge him only for good cause.

*Disposition*

The judgment is affirmed.  Respondent shall recover his costs on appeal.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

.13

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____

Joseph Dulles Allen, for Appellant

Ben Pettit and Robert M. Ungar, for Respondent.