Filed 11/29/22  BMO Harris Bank N.A. v. Hassanally CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BMO HARRIS BANK N.A., <br>     Plaintiff and Respondent, <br> v. <br> RAHIM HASSANALLY et al., <br>     Defendants and Appellants. | A162824 <br><br> (Solano County Super. Ct. No. FCS051806) |

This case is one of several lawsuits precipitated by the closure of several vehicle dealerships following their default on loan and lease obligations.  The instant appeal arises from the final chapter of litigation brought by BMO Harris Bank, N.A. (the Bank) to enforce its floor financing loans for the Mitsubishi dealership.  Following liquidation of the dealership's assets, the Bank sought a deficiency judgment, first moving for summary adjudication of its damages.  Appellants opposed the motion, challenging the "commercial reasonableness" of the Bank's disposition of certain assets,

1

namely the remaining new Mitsubishi vehicle inventory and the remaining used vehicle inventory.[1] The trial court ruled in favor of the Bank.[2]

After several additional hearings and stipulations by the parties, the court allocated the disposition proceeds and other monetary items, determined the amount of the Bank's deficiency judgment, and terminated the receivership that had been put in place to assist with the liquidation.

Appellants maintain the trial court erred in its summary adjudication rulings. We affirm.

## DISCUSSION[3]

*Appealability*

The Bank asserts there are two procedural obstacles to appellants' appeal: (1) that appellants appealed from the non-appealable summary adjudication order and not from the later-entered final judgment, and (2) that they stipulated to the terms of the final judgment. While it is true that an appeal from a non-appealable order or from a stipulated judgment must often be dismissed, that is not so in the instant case.

The Courts of Appeal have many times stated that an appeal will not lie from an *order* granting or denying summary adjudication or from an *order* granting summary judgment. Rather, an appeal lies from the final *judgment*

---

[1] Appellants are not the dealerships, themselves, but a corporate entity with an ownership interest in the Mitsubishi dealership (Fairfield CJD, LP d/b/a Momentum CDJR-Fairfield) and an individual guarantor (Rahim Hassanally).

[2] Although denominated a motion for summary judgment or summary adjudication, the order at issue ruled in favor of the Bank on certain legal issues and fixed the damages benchmark, but as we explain, it did not resolve all issues between the parties or conclude the litigation.

[3] We discuss the pertinent facts and procedural aspects of the case in connection with our discussion of the issues raised on appeal.

entered pursuant to such an order.[4]  (*Mitchell v. Los Robles Regional Medical Center* (2021) 71 Cal.App.5th 291, 296, fn. 2 (*Mitchell*); *Taylor v. Trimble* (2017) 13 Cal.App.5th 934, 939 (*Taylor*).)  Thus, an appeal from such an order is premature and must be dismissed.

Appellants' assertion that we should "classify" the summary adjudication order, itself, as a final judgment misses the mark.  " 'Generally, an order granting summary adjudication is an intermediate order which is "reviewable on appeal from the final judgment in the action." ' "  (*Wilson v. County of San Joaquin* (2019) 38 Cal.App.5th 1, 7, italics omitted.)  Such an order is immediately appealable only if it " 'effectively disposes of the entire matter' "—for example where it *wholly* removes one of several defendants from the case, or where other pending causes of action are *wholly* duplicative of the cause(s) of action resolved by summary adjudication.  (*Ibid.*)

Here, while the summary adjudication order may have resolved the principal substantive issues in the case and set the damages base mark, issues remained as to the exact amount of the deficiency judgment and the discharge of the receiver.  Accordingly, the order did not fully resolve all issues between the parties.

Nevertheless, where, as here, a final judgment is entered after a premature appeal from a summary adjudication or summary judgment order, the appellate courts generally will deem the appeal to be from the ensuing

---

[4]  The trial court flatly told appellants at the outset of the first post-summary adjudication hearing that the litigation was not concluded, that it "need[ed] [a] happy little document saying 'judgment,' " and that "the appeal [was] premature," as were the Bank's motions for fees and costs.

3

final judgment, and we will do so in this case.[5] (*Mitchell, supra,* 71 Cal.App.5th at p. 296, fn. 2; *Taylor, supra,* 13 Cal.App.5th at p. 939.)

It is also generally the case that a party cannot appeal from a judgment to which it stipulated. (See, e.g., *Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156, 160 [appellant estopped from attacking the validity of the judgment to which she stipulated]; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 400 (*Norgart*) [" 'by consenting to the judgment or order the party expressly waives all objection to it, and cannot be allowed afterwards, on appeal, to question its propriety' "].)

An exception to this rule permits an appeal " ' "[if] consent was merely given to facilitate an appeal following adverse determination of a critical issue." ' " (*Norgart, supra,* 21 Cal.4th at p. 400; accord, *Harrington-Wisely v. State of California* (2007) 156 Cal.App.4th 1488, 1495; *Cadle Co. II, Inc. v. Sundance Financial, Inc.* (2007) 154 Cal.App.4th 622, 625 ["decades of case law hold[] that a party stipulating to a judgment waives the right to appeal unless the purpose of the stipulation was to facilitate an appeal"].)

Appellants maintain they stipulated only to the calculated deficiency numbers that inevitably flowed from the trial court's summary adjudication order, and they did not stipulate to any of the court's predicate legal rulings

---

[5] We caution appellants, however, that saving a premature appeal by deeming it to be from a subsequently entered final judgment, is wholly within the discretion of the appellate court. And should a court decline to save a premature appeal and should the party have failed to timely appeal from the subsequent final judgment—as appellants failed to do here and despite the trial court having expressly told them before it entered final judgment that their appeal was premature—the party will entirely lose its right to appeal, as appellants would here if we declined to exercise our discretion to save their premature appeal.

4

set forth in that order.  They further insist that they so stipulated to facilitate an appeal from the summary adjudication order.

As the Bank points out, however, appellants can hardly have stipulated " 'to facilitate' " an appeal, since they had already (albeit improperly) appealed from the summary adjudication order.  It further asserts that the stipulated judgment resulted from negotiations wherein the Bank agreed to forego a portion of the interest to which it claimed it was entitled.  Thus, the Bank characterizes the stipulated judgment as a negotiated, final resolution of the dispute to which appellants agreed and from which they cannot attempt to back out by way of an appeal.

It is a close question whether appellants can invoke the "to facilitate an appeal" exception to the general rule that an appeal will not lie from a stipulated judgment.  Appellants plainly thought they had already appealed from the summary adjudication order.  And at no place in the record concerning entry of final judgment, did appellants state they were agreeing to a stipulated judgment only to hasten their ability to appeal the adverse summary adjudication rulings. (Compare *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 816 [written agreement stated sole purpose of stipulated judgment was to permit plaintiff to appeal trial court's adverse summary adjudication rulings]; *Sargon Enterprises, Inc. v. University of Southern California* (2013) 215 Cal.App.4th 1495, 1507 [stipulation stated parties agreed and acknowledged that sole purpose of stipulated judgment was to hasten transfer of the case to the appellate court and facilitate plaintiff's appeal following an adverse determination of " 'critical issue' "].)

However, at two points during the post-summary adjudication hearings concerning the entry of final judgment, the trial court commented on appellants' appeal.

5

At the first such hearing, after reminding the parties the case was not concluded by the summary adjudication order and the court needed to enter a final judgment resolving the remaining issues (including calculating the exact amount of the deficiency judgment and discharging the receiver), the court made the following comment to appellants' counsel: "I don't think, Mr. Amin, that it's [referring to the further proceedings necessary to prepare a final judgment] going to change anything for your appeal. I don't think anybody really—you know, you guys can fight about whether that's premature or untimely or just agree that it is what it is." The court further stated in explaining it's need for actual numbers for the judgment: "Mr. Amin, by stipulating to this number [that] does not necessarily mean—and we can put a proviso in there—that you are giving up any rights to contest the summary judgment findings or the orders or any of that. I'm just trying to get a number so that you guys can be done with this chapter and do whatever needs to happen next."

At the second hearing, the court drilled down into the numbers presented by the receiver and the lenders, initially expressing unhappiness at the parties' efforts to provide the numbers necessary to calculate the final judgment and sending them out for further discussions. It is clear the court wanted the parties to return with an agreed-to resolution of the remaining issues concerning the numbers and the discharge of the receiver. The court commented appellants had "already filed an appeal, and he's got that right, I don't have any problem with it," but it wanted to "connect[] all the dots" when it came to the numbers in the judgment.

On recalling the case, the court first turned to the final judgment as to the Bank, stating it had "a new stipulated judgment hot in my hand." It then asked counsel for the Bank and for appellants to confirm that they

6

"stipulated to this form of the judgment," and both said they did. The court also confirmed that the stipulated judgment encompassed the principal and prejudgment interest set forth in the summary adjudication order, the credits to be applied to reduce those amounts, and a reduction the Bank agreed to accept to resolve the interest owed. The court then reconfirmed appellants were "approving as to form the stipulated judgment" and signed the stipulated judgment. The judgment did not include the proviso the court had earlier suggested expressly preserving appellants' right to appeal the merits of the court's summary adjudication rulings.

Thus, it can hardly be said that appellants took any steps to come within the "to facilitate an appeal" exception to the general rule that no appeal will lie from a stipulated judgment. Indeed, they made no record, themselves, to come within this exception. Thus, contrary to appellants' assertion that "even a cursory examination" of the record "clearly indicates that consent to the stipulated judgment was provided for the sole purpose of facilitating the present appeal," an examination of the record shows no such thing. To the contrary, all appellants can point to are a couple of comments by the trial court that their appeal from the summary adjudication order appeared to be premature and that by entering into a stipulation as to the remaining issues, they were not "necessarily" giving up their right to appeal the summary adjudication rulings. At best, appellants' silence in the face of the court's comments suggests an implied reservation of their right to appeal the rulings.

Nevertheless, it is apparent that the stipulation resolved only the *remaining* issues in the case and did not pertain to the merits of the court's summary adjudication rulings. Thus, while by only a gossamer thread, we conclude the balance tips toward allowing appellants' appeal to proceed.

7

*The Summary Adjudication*

" '[S]ummary judgment law in this state no longer requires a plaintiff moving for summary judgment to disprove any defense asserted by the defendant as well as prove each element of his own cause of action. . . . All that the plaintiff need do is to "prove[ ] each element of the cause of action." [Citation.]' (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853. . . .) Once the plaintiff makes an adequate initial showing, the burden shifts to the defendant to show a triable issue of fact 'as to that cause of action or a defense thereto.' (Code Civ. Proc., § 437c, subd. (p)(1).)" (*WRI Opportunity Loans II, LLC v. Cooper* (2007) 154 Cal.App.4th 525, 531–532 (*WRI Opportunity Loans*).)

On appeal after a motion for summary adjudication or " 'judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]' (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334. . . .) We thus apply ' "the same three-step process required of the trial court. [Citation.]" ' (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662. . . .) The three steps are (1) identifying the issues framed by the complaint, (2) determining whether the moving party has made an adequate showing that negates the opponent's claim, and (3) determining whether the opposing party has raised a triable issue of fact. (*Ibid.*)" (*WRI Opportunity Loans, supra,* 154 Cal.App.4th at p. 531.)

*Sufficiency of Statement of Reasons*

Appellants first contend the trial court's order granting summary adjudication failed to comply with the statutory requirement that such an

order must "specifically refer to the evidence proffered in support of and, if applicable, in opposition to the motion." (Code Civ. Proc., § 437c, subd. (g).)

"A statement of reasons is sufficient if it allows for meaningful appellate review." (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448.)

In *W.F. Hayward Co. v. Transamerica Ins. Co.* (1993) 16 Cal.App.4th 1101, for example, the appellant argued, as do appellants here, that the trial court's order did not comply with Code of Civil Procedure section 437c, subdivision (g). "[T]he court's minute order specifically stated, '. . . plaintiff failed to file his claim against the surety within six (6) months of the time the stop action could have been filed, as required by Civil Code 3249,' " and the " '[m]otion is granted on grounds set forth in the moving papers, including defendant's separate statement of undisputed facts.' " (*Id.* at pp. 1110–1111.) The judgment stated, " 'Plaintiff failed to file suit on its claim against the payment bond of Transamerica Insurance Company within six (6) months, after the time stop notices could have been filed, as required by Civil Code Sections 3249 and 3184.' " (*Id.* at p. 1111.) The Court of Appeal concluded, "[f]or purposes of meaningful appellate review (a key objective of subdivision (g) of section 437c), the court's statement of reasons [was] quite adequate. Certainly, there [was] no question about the reason this motion for summary judgment was granted." (*Ibid.*; see, e.g., *Wedeck v. Unocal Corp.* (1997) 59 Cal.App.4th 848, 864 [trial court's written and oral orders made clear that ruling was based on a finding that all the evidence established defendant was plaintiff's special employer as a matter of law].)

Here, the trial court filed a two-page written order that attached and incorporated the court's six and a half page, single-spaced, tentative ruling. The tentative ruling provided a procedural history of the motion (which was

9

originally filed before all the assets were liquidated and was refiled after completion of the liquidation) and addressed the import of the suspension of the dealerships, the appointment of the receiver, and the failure of the dealerships to oppose motions for summary adjudication as to them. The court then turned to the merits of the Bank's motion for summary adjudication of its "damages." Stating there was no dispute of material fact as to the "principal balance" owed on the floor financing loans, the court turned to the issue of "commercial reasonableness," first setting forth the governing law, including stating that "[g]enerally, commercial reasonableness depends upon the circumstances which existed as of the time of sale, and is not established merely because a higher price might have been obtainable under other circumstances or time."

The court then stated: "[The Bank's] moving papers establish facts to support that the liquidation of assets was done in a commercially reasonable manner. The burden shifted to Defendants to establish a triable issue of fact that the liquidation was not done in a commercially reasonable manner. Other than speculative argument, Defendants offer no evidence—not even an expert opinion—that [the Bank's] liquidation was not completed in a commercially reasonable manner."

It then explained, in three paragraphs, why appellants' specific objections to the disposition of the new vehicle inventory of the Volkswagen and Hyundai dealerships, and the new vehicle inventory of the Mitsubishi dealership at issue here, were unfounded. As to the latter, addressed in two of the paragraphs and a footnote consisting of another full paragraph, the court cited specifically to the declaration of Jack Kane submitted in support of the Bank's motion. The court then spent another two paragraphs

10

discussing appellants' specific objections to the Bank's disposition of the used vehicle inventory.

In its written order, the court stated "[a]fter full consideration of the evidence submitted by the parties, the Court finds that there is no triable issue of any material fact and [the Bank] is entitled to judgment as a matter of law . . . for the reasons set forth in the Court's tentative ruling attached hereto as Exhibit A (adopted as the final ruling of the Court), which are hereby incorporated by reference as the Court's findings as though fully set forth herein."

As was the case in *W.F. Hayward Co.,* there is no question as to the reasons why the trial court granted the Bank's motion for summary adjudication, and the court's written order incorporating its minute order allows for meaningful appellate review. This is particularly so given that nearly all of the Bank's evidence as to its handling and disposition of the assets was set forth in Kane's declaration.

In any case, since a trial court's role in deciding a motion for summary adjudication or summary judgment does not involve fact-finding in the traditional sense and its role is limited to determining whether there are any material triable issues of fact and, if there are not, whether the moving party is entitled to summary adjudication or judgment as a matter of law, the sufficiency of the court's statement of reasons "is much less important for review than a statement of decision upon a trial of a question of fact." (*Soto v. State of California* (1997) 56 Cal.App.4th 196, 199.) Accordingly, even a statement of reasons that fails to comply with Code of Civil Procedure section 437c, subdivision (g) provides no basis for reversal where "independent review [on appeal] establishes the validity of the judgment." (*Soto,* at p. 199.; *Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772,

11

782.)  As we shall explain, the record here demonstrates the court properly granted the Bank's motion for summary adjudication.

At some points in their briefing, appellants seem to approach the sufficiency-of-the-statement-of-reasons issue in a slightly different way—they maintain the trial court improperly put the "burden" on them to establish that the vehicle sales at issue were not commercially reasonable, contrary to the mandate of the Commercial Code that, when the issue of commercial reasonableness of collateral disposition is raised, "the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance [of the collateral] was conducted in accordance with this chapter." (Com. Code, § 9626, subd. (a)(2)[6]; see § 9610, subd. (b) ["Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."].)

Appellants acknowledge that the trial court stated that the Bank, " 'as the secured creditor bears the initial burden to establish that liquidation of assets occurred in a commercially reasonable manner.' " They complain, however, that the court "focuse[d] almost exclusively on Defendants' Opposition's alleged shortcomings rather than citing to evidence which might confirm [the Bank] met [its] initial burden. . . .  [T]he trial court never identified [the Bank's] admissible evidence which proved that it acted in a commercially reasonable manner."  As we have discussed, however, the trial court's order was not deficient in this regard.

***Evidentiary Rulings***

---

[6] All further statutory references are to the Commercial Code unless otherwise indicated.

Defendants next claim the trial court erred in overruling their objections to several portions of the declaration of Jack Kane, submitted by the Bank in support of its motion for summary adjudication.

A trial court generally enjoys wide discretion in ruling on evidentiary objections. Accordingly, most appellate courts review a trial court's evidentiary rulings for abuse of discretion even in the context of a summary judgment motion. (See *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852 ["According to the weight of authority, appellate courts 'review the trial court's evidentiary rulings on summary judgment for abuse of discretion.' " Quoting *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679.]; *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 ["Although it is often said that an appellate court reviews a summary judgment motion 'de novo,' the weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard."]; see generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶ 8.168, p. 8-148 ["Pursuant to the weight of authority, appellate courts review a trial court's rulings on evidentiary objections in summary judgment proceedings for abuse of discretion."].)

Nevertheless, "[t]o determine if a court abused its discretion, we must consider 'the legal principles and policies that should have guided the court's actions.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773. For example, a court's discretion to exclude expert testimony "is not unlimited" where it implicates a party's ability to present its case. (*Ibid.*) "Rather, it must be exercised within the confines of the applicable legal principles." (*Ibid.*) Accordingly, one Court of Appeal

13

recently examined *de novo* a "*Sanchez*"[7] challenge to the admissibility of expert testimony in the summary judgment context, concluding the trial court improperly excluded the declaration testimony of one proffered expert but properly excluded that of three other proffered experts. (*Strobel v. Johnson & Johnson* (2021) 70 Cal.App.5th 796, 800, 816, 824–825, 827–828.) While appellants interposed hearsay objections to Kane's testimony in the trial court, they did not couch these as *Sanchez* objections. Nor have they cited to *Sanchez* in their briefing on appeal.

Turning to Kane's declaration, he averred that he was the "Managing Director & Team Lead in the Corporate & U.S. Commercial Special Accounts Management Unit" of the Bank (we will refer to Kane and his team as the "asset management team") and personally managed the Bank's relationship with appellants and the Bank's liquidation of the dealership assets.

Appellants interposed four objections to Kane's declaration. The trial court sustained one and overruled the other three. Appellants challenge two of these rulings, specifically to objections 2 and 4.

### Objection No. 2

Appellants' second objection included an objection to the following statement by Kane: " '[The Bank] negotiated a deal on substantially similar terms that a dealer would have been able to negotiate under the California Vehicle Code with respect to the Infiniti, Volkswagen, and Hyundai manufacturers, with each such manufacturer repurchasing their respective vehicles at the full financed amounts, minus nominal fees and offsets.' " Appellants contend this was an "improper expert witness opinion," as Kane "offered no evidence as to an educational background or professional experience that would qualify him to render a legal opinion on whether

[7] *People v. Sanchez* (2016) 63 Cal.4th 665.

14

certain vehicles were subject to the California Vehicle Code's repurchase requirements of manufacturers in connection with the termination of an auto-dealer franchise."

We first observe this was a peculiar objection for appellants to make. As we shall discuss in more detail, appellants' principal argument as to why the Bank's disposition of the new Mitsubishi vehicles was commercially unreasonable was, and remains, that the Bank too quickly liquidated the vehicles through auctions, rather than waiting until the dealership franchise was terminated some nine months later, at which point Mitsubishi assertedly would have been statutorily obligated under the Vehicle Code to repurchase the new inventory at, appellants maintain, a much higher price than the price the cars fetched at auction. In other words, appellants, themselves, felt free to assert that the new vehicle inventory was subject to statutory manufacture repurchase, yet, nevertheless, maintained Kane, who was the Bank's team lead for liquidation of the dealership vehicle assets, did not have the qualifications to make such a statement.

In any case, the trial court did not abuse its discretion in overruling appellants' objection to Kane's statement. Appellants, themselves, submitted portions of Kane's deposition evidencing that he was aware of the Vehicle Code repurchase provisions and was also familiar with the repurchase agreements with Infiniti, Volkswagen, and Hyundai for their respective new vehicles. Moreover, in his declaration, Kane stated he had personal knowledge of the matters set forth in his declaration, and that after the court entered a stipulation between the Bank and the dealerships authorizing the Bank to take possession of and dispose of the new vehicle collateral securing the floor financing, the Bank commenced negotiations with the manufacturers and secured, before those franchises were terminated,

15

repurchase agreements with Infiniti, Volkswagen, and Hyundai substantially similar to what is contemplated under the Vehicle Code on termination of a franchise.  In short, Kane had ample basis to make the challenged statement.

Appellants' second objection also included an objection to the italicized language in the following statement:  " 'As a result of the Dealership Defendants' pending eviction and Mitsubishi's refusal to repurchase their eligible vehicles, the Mitsubishi vehicles and *the remaining new vehicles that were not eligible for repurchase by their respective manufacturers* were transported offsite.' "  All appellants say in their opening brief with respect to this italicized phrase is that they "objected to the statement" "as lacking foundation and speculative, an improper legal conclusion, and hearsay, to the extent Mr. Kane was being told what new vehicles were not eligible for repurchase by their respective manufacturers."  They offer no discussion or argument as to why the trial court purportedly erred in not sustaining their objection and have therefore waived the issue.  (See *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 360 [" ' " 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' " ' " Quoting *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.].)

In any case, as we shall explain, the objected-to phrase is irrelevant to the instant appeal, as appellants' commercial unreasonableness argument as to the Bank with respect to new vehicles concerns only its disposition of the new Mitsubishi vehicles, not any other new vehicles.

### Objection No. 4

In their fourth objection, appellants objected to the following statement by Kane:  " '[The Bank] fully performed under the IFSA and the other Loan

16

Documents and extended financing to the Dealership Defendants.' "
Appellants contend this statement was "both improper expert opinion and a
legal conclusion," and Kane "provided no basis upon which to [so] opine."[8]

Kane stated in his declaration that he personally reviewed and was
familiar with all the relevant loan documentation and the records reflecting
the status of the loans. He therefore had ample basis for stating the Bank
had, in accordance with the loan documentation, made the floor loans.

In any case, this objected-to statement is also immaterial to the instant
appeal—it was undisputed the Bank extended the financing and appellants
were in default. Rather, the only issues that were litigated were whether the
Bank's disposition of the vehicles securing the loans was commercially
reasonable and the amount of the deficiency judgment. Accordingly, the
court's ruling on the objection is of no consequence at this point.

### *Commercial Reasonableness (New Vehicles)*

While appellants make several general assertions that "the record
shows [the Bank] did not sell collateral in the usual manner, nor in any
recognized market therefor," the only specific argument they make and
develop in their opening brief pertains to the new Mitsubishi vehicles.

In this regard, our Commercial Code provides:

*Section 9610*

"(a) After default, a secured party may sell, lease, license, or otherwise
dispose of any or all of the collateral in its present condition or
following any commercially reasonable preparation or processing.

---

[8] In the trial court, appellants also raised a hearsay objection.
However, in their opening brief, other than stating they made such an
objection in the trial court, they make no argument as to this ground and
have therefore waived it. (See *United Grand Corp. v. Malibu Hillbillies, LLC*
(2019) 36 Cal.App.5th 142, 153 (*United Grand*) [argument forfeited where
appellant failed to support points "with cogent argument, legal authority or
specific citations to the record"].)

"(b) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

"(c) A secured party may purchase collateral at either of the following:

"(1) At a public disposition.

"(2) At a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations." (§ 9610, subds. (a), (b), (c)(1)–(2).)

*Section 9626*

"(a) In an action arising from a transaction, other than a consumer transaction, in which the amount of a deficiency or surplus is in issue, the following rules apply:

"(1) A secured party need not prove compliance with the provisions of this chapter relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance in issue.

"(2) If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this chapter.

"(3) Except as otherwise provided in Section 9628, if a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this chapter relating to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of either of the following:

18

"(A) The proceeds of the collection, enforcement, disposition, or acceptance.

"(B) The amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this chapter relating to collection, enforcement, disposition, or acceptance."  (§ 9626, subd. (a)(1)–(3)(A) & (B).)

*Section 9627*

"(a) The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

"(b) A disposition of collateral is made in a commercially reasonable manner if the disposition satisfies any of the following conditions:

"(1) It is made in the usual manner on any recognized market.

"(2) It is made at the price current in any recognized market at the time of the disposition.

"(3) It is made otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

"(c) A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved in or by any of the following:

"(1) In a judicial proceeding.

"(2) By a bona fide creditors' committee.

"(3) By a representative of creditors.

"(4) By an assignee for the benefit of creditors.

"(d) Approval under subdivision (c) need not be obtained, and lack of approval does not mean that the collection, enforcement, disposition, or acceptance is not commercially reasonable." (§ 9627.)

Ultimately, "[t]he inquiry whether a sale was commercially reasonable under section 9504, subdivision (3), including whether it was adequately publicized, is intensively factual and 'the answer depends on all of the circumstances existing at the time of the sale.' (*Clark Equipment Co. v. Mastelotto, Inc.* [(1978)] 87 Cal.App.3d 88, 96.) A reviewing court must not disturb a trial court's factual findings or conclusion on this question unless no substantial evidence supports them. (*Peery v. Superior Court* (1981) 29 Cal.3d 837, 845.[9])" (*Ford & Vlahos v. ITT Commercial Finance Corp.* (1994) 8 Cal.4th 1220, 1235.)

This does not mean that summary adjudication or summary judgment is inherently precluded. Where the material facts are undisputed and no reasonable finder of fact could conclude other than that the challenged disposition of collateral was commercially reasonable, summary adjudication or judgment is proper. (See *Bank of America, N.A. v. Sea-Ya Enterprises, LLC* (D. Del. 2012) 872 F.Supp.2d 359, 366–367 [applying California law and granting summary judgment for bank on issue of commercial reasonableness].)

Appellants' claim that the Bank failed to establish that its disposition of the new Mitsubishi vehicles was commercially reasonable, boils down to their assertion that the Bank should not have disposed of the vehicles by auction when it did, but should have waited to dispose of the vehicles until the Mitsubishi franchise was terminated, at which point, the manufacturer

---

9 Superseded by statute on other grounds as stated in *Amalgamated Bank v. Superior Court* (2007) 149 Cal.App.4th 1003, 1013–1015.

would have been statutorily required under Vehicle Code section 11713.13 to repurchase the vehicles for amounts, according to appellants, far in excess of those received at auction.[10]

We first address the Bank's assertion that Vehicle Code section 11713.13 is irrelevant to this case because it sets forth the duties of a vehicle manufacturer to a franchisee on the termination of a dealer franchise and does not set forth any duties of a secured creditor. Rather, the relevant rights and obligations of a secured creditor pertaining to the disposition of collateral are set forth in the Commercial Code. While the Bank is correct as to whom the Vehicle Code and Commercial Code duties pertain, this does not respond to appellants' basic argument—that had the Bank waited to dispose of the new Mitsubishi vehicles until the dealer franchise was terminated, Mitsubishi would then have been statutorily required to repurchase the cars, resulting in, according to appellants, significantly more proceeds than were yielded by auction.

We therefore turn to the evidence in the record as to the commercial reasonableness of the Bank's selling the new Mitsubishis through Manheim Auctions, rather than waiting until the termination of the dealer franchise, triggering Mitsubishi's statutory duty to repurchase the new vehicles.

Appellants insist commercial unreasonableness is self-evident by virtue of the fact the auction sales yielded amounts far below the dealer's costs for the new vehicles and, according to appellants, far below what Mitsubishi

---

[10] Although the parties have to some extent viewed the commercial reasonableness issue as two-fold—(1) challenging the sales by auction and (2) the timing of the dispositions—appellants' basic assertion is that the Bank should have waited to dispose of the inventory until the dealer franchise was terminated and then forced Mitsubishi to comply with its statutory duty to repurchase the new car inventory.

would have been required to pay on repurchase on termination of the franchise. There is, however, much more to the story than appellants' highly selective rendition.

By March 2018, appellants were in default on their obligations to the Bank. The parties subsequently negotiated and entered into two, successive forbearance agreements, the first in March and the second in August. When appellants remained in default, the Bank filed suit in early November for breach of the financing agreements and to recover its damages and secure a deficiency judgment after disposal of the secured assets.

In late November, the court entered a stipulation between the Bank and the dealerships, including the Mitsubishi dealership, authorizing the Bank to take possession of, market, and dispose of some of the collateral vehicles, including the new Mitsubishi vehicles.

By that time, the Mitsubishi dealership was, in addition to being in default on the loans, in default on its lease and facing eviction from the premises. Indeed, in mid-November, the dealership had been closed, leaving the Bank to contend with 124 new Mitsubishi vehicles that could not remain on the abandoned, and soon to be seized, premises.

The Bank's asset management team had begun working with all the auto manufacturers associated with appellants' various dealerships to ensure orderly disposition of the secured collateral, and the Bank successfully negotiated new-vehicle repurchasing agreements with Infiniti, Volkswagen, and Hyundai whereby the manufacturers agreed to repurchase their vehicles "at the full financed amounts, minus nominal fees and offsets." The Bank considered these terms "substantially similar" to what the dealerships, themselves, would have been able to negotiate pursuant to Vehicle Code section 11713.13 on termination of the franchises.

However, despite three months of effort to negotiate a similar repurchase by Mitsubishi, the manufacturer refused to discuss such a deal with the Bank and took the position it had no repurchase obligation until its franchise was actually terminated.

Mitsubishi's intransigence is not all that surprising, given that appellants responded to the company's November 28 notice terminating the franchise by filing a protest with the Motor Vehicle Board—a move guaranteed to drag out the process even though appellants had abandoned the dealership premises. It also meant Mitsubishi did not, at that point, have any obligation under the Vehicle Code to repurchase the new Mitsubishi vehicles. (See *Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1077 [when a protest is filed, " 'the franchisor may not terminate or refuse to continue until the board makes its findings,' " quoting Veh. Code, § 3060, subd. (a)(2), italics omitted].)

And, indeed, the protest proceeding lumbered along and did not conclude until August 15, 2019, and that disposition date only occurred because Mitsubishi filed a motion to dismiss the protest on the ground the undisputed facts showed good cause to terminate the franchise.

In granting Mitsubishi's motion, the administrative law judge (ALJ) explained that upholding appellants' protest would be "a meaningless act." "[O]rdering that the contractual relationship continue to exist will not result in the re-opening of the dealership that has been closed for an excessive amount of time nor will requiring [Mitsubishi] to maintain its contractual relationship with [the dealership] change the fact [the dealership] has no assets that would be lost by termination of the franchise. [The dealership] has no location for the facility from which to operate the dealership, has lost its inventory, and has lost all of its other assets to the claims of its

creditors.[11]  In addition, [the dealership] no longer ha[d] a 'valid' occupational license from the Department of Motor Vehicles and is insolvent." Further, sustaining the protest would "leave the parties and the consuming public where they have been since November 2018– with no Mitsubishi sales being made, with no service available to the public, no warranty obligations of [the dealership] being performed on customers' vehicles, and no benefits to the public that would accrue if the dealership had been operational."  The ALJ, thus, found there was good cause to terminate the franchise and proceeding further with the protest "would be an exercise in futility."

In the meantime, after Mitsubishi refused to talk to the Bank about a negotiated repurchase agreement, and with the dealership being evicted from the premises, the Bank, in March 2019, sent the new Mitsubishi vehicles to the Manheim vehicle auction.  Manheim "is a large (if not the largest) wholesale automobile auction company in the United States."  It "regularly deals in automobile auctions, and provided notice of the auction and marketed it to commercial auto dealers, including, specifically, Mitsubishi dealers."[12]  At the first auction, 114 of the new vehicles sold.  It took several additional auctions to dispose of the remaining 10 vehicles.

The Bank acknowledged new vehicle inventory is generally not disposed of through auction—because in most liquidation situations, the manufacture is either statutorily obligated to repurchase the new vehicles or

---

[11]  By this point, the Bank had long since been authorized to take possession of and dispose of the dealership's new vehicle inventory.  It had also been authorized by stipulation to take possession of and dispose of the used car inventory, and a receiver had, also by stipulation, been appointed to liquidate, and had liquidated, all the other assets.

[12]  Appellants do not take issue with either the notice given by the Bank or with the publicity provided by Manheim.

agrees to a pre-franchise termination repurchase as did Infiniti, Volkswagen, and Hyundai. However, Mitsubishi's statutory obligation had not been triggered (and remained on hold until appellants' protest was disposed of), and Mitsubishi refused to negotiate a pre-termination repurchase.

Several months after the liquidation of the new vehicles, the court entered a stipulation between the Bank and the dealerships, including the Mitsubishi dealership, authorizing the Bank to take possession of, market, and dispose of the used car collateral. The Bank then liquidated the used cars through Manheim.

The following month, the court entered a third stipulation between the Bank and the dealerships appointing a receiver and authorizing the receiver to monetize substantially all of the remaining dealership property. The receiver, like the Bank, "used Manheim to liquidate any remaining vehicles in accordance with the same procedures" that had been applicable to the Bank.

We agree with the trial court that this evidence, which was undisputed, was sufficient to carry the Bank's burden of establishing that its disposition of the new Mitsubishi vehicles was commercially reasonable. In focusing solely on an asserted significant disparity in the proceeds generated through auction sales and what Mitsubishi assertedly would have paid many months later to repurchase the vehicles when the franchise was finally terminated, appellants ignore the statutory directive that the "fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner." (§ 9627, subd. (a).)

25

Moreover, appellants did not present any *evidence* contradicting the Bank's showing.  They did not, for example, submit a single declaration that discussed what could reasonably have been expected in connection with a repurchase of the new Mitsubishi vehicles *after* the protest was concluded and the franchise was terminated (by which time the new vehicles would have been a year old).  Instead, they presented, for 15 of the new vehicles, a comparison of the dealer's invoices—the amount for which they claimed the manufacturer would have had to repurchase the vehicles (less any dealer incentives)—and the amount netted at the auction.  This comparison, according to appellants, showed an average "loss" of $9,917.08 per vehicle, which multiplied by 124 showed a supposed disparity between repurchase and auction of $1.229 million.

Not only is this comparison based on one assumption after another that is unsupported by any *evidence,* but such a myopic, hind-sight analysis disregards all the other circumstances that existed *at the time* despite the fact commercial reasonableness " 'depends on all the circumstances existing at the time of the sale.' " (*Jack in the Box, Inc. v. Mehta* (N.D. Cal. 2014) 2014 WL 2069530 at p. *2.)  As we have recited, given the imminent eviction of the dealership from its premises and Mitsubishi's refusal to negotiate a pre-franchise termination repurchase agreement, the Bank had little choice but to liquidate the cars immediately and reasonably did so through a well-established vehicle auction house.

While appellants repeatedly complain that the new vehicles were sent to Manheim, pointing to Kane's deposition testimony that it is unusual for new car inventory to be disposed of by auction, they do not suggest that, at the time, any other manner of disposition was feasible, but assert instead, that the Bank should have waited to dispose of these vehicles until the dealer

franchise was terminated, when Mitsubishi would have been statutorily required to repurchase them. Accordingly, as appellants have crafted their argument, the problem with the new car dispositions was not use of Manheim, per se, but rather, in failing to wait to dispose of the vehicles through repurchase.[13] However, for all the reasons we have discussed, that argument does not carry the day.

### Commercial Reasonableness (Used Vehicles)

In the trial court, appellants also challenged the commercial reasonableness of the Bank's disposition of the used vehicle inventory on the ground no "reserve" floor price was placed on the auction price of these vehicles. While appellants made mention of this argument in one paragraph of their "Statement of Facts" in their opening brief on appeal, they did not thereafter raise, let alone develop, this point in the "Argument" section of their opening brief. Indeed, they made no mention of the used vehicles at all in the argument section of their opening brief.

In its respondent's brief, the Bank apparently assumed appellants' one-paragraph procedural recitation was an argument, to which it responded in similarly cursory terms, pointing out appellants claimed "without support or authority" that the Bank should have utilized a reserve.

---

[13] It therefore makes little difference in this case that courts that have found auto auction sales commercially reasonable have generally done so in the context of used vehicles. (See, e.g., *In re Estate of Sagmiller* (N.D. 2000) 615 N.W.2d 567, 570 [stating "[c]ourts in several jurisdictions, under many contexts, have held dealers-only auctions may constitute commercially reasonable sales"].) As Kane explained, manufacturers generally want to avoid the auctioning of new vehicles and therefore enter into repurchase agreements to avoid any negative impact on the market value of the new vehicles. But, here, Mitsubishi took a different stance and refused to repurchase the new car inventory, allowing it to go to auction.

27

In their closing brief, appellants for the first time advanced the argument that the disposition of the used vehicles was commercially unreasonable for failure to use reserve pricing. It is well-established, however, that arguments advanced for the first time in a reply brief may be disregarded, and we do so here. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766 [court refused to consider issues raised in reply brief that were not raised in opening brief].)

In any case, appellants provide no authority in support of their assertion that "utilization of reserve prices is clearly relevant to whether the used vehicles were sold in a commercially reasonable manner," and have therefore forfeited the issue. (See *United Grand, supra,* 36 Cal.App.5th at p. 153.) Moreover, given the *entirety* of the circumstances at the time, which we have discussed above, the Bank's disposition of the used vehicles through a major vehicle auction house was imminently commercially reasonable.

### Other "Damages" Issues

Appellants advance several other arguments pertaining to the "amount" of damages. None has merit.

They first claim the trial court failed to address their argument that the Bank unnecessarily maintained insurance on the vehicles until they were sold and title was transferred, since the franchisors were required to bear the risk of loss and secure insurance for the vehicles while in transit for inspection. Appellants point out that a secured creditor is entitled only to "reasonable expenses of collection and enforcement" of its security interest. (§ 9608, subd. (a)(1)(A).) They complain that "[w]ith estimated costs exceeding one million dollars and Respondent's person most knowledgeable [Jack Kane] unable to identify what the insurance costs were, what was paid to have a third party-manage the vehicle inventory, or a breakdown of either

28

figure, the commercial reasonability of these cost[s] was clearly put at issue and demonstrates that the property was not disposed of in a commercially reasonable manner."

We are perplexed by this argument, given the court's order, incorporating its minute order, granting the Bank's motion for summary adjudication. The order states that "[n]o material dispute of fact exists as to the principal balance" owed on the loans and there is no dispute as to the "net recoveries from liquidation of [the] collateral" as set for in Kane's declaration. The order further states that "[the Bank's] moving papers also seek [an] award of $781,361.17 in professional fees as damages. However, other than the declaration of [counsel] establishing attorneys' fees and expenses (which is not referenced in the Separate Statement and does not seem to be included), [the Bank] provides no evidentiary support for these expenses. *Defendants dispute expenses for insurance, monitors, security. (Defendants' Opposition to [Bank's] SS 8, 12.) As the moving party, [the Bank] bears the burden to present admissible evidence to show these damages exist and has not met its burden.*"

Thus, it appears that, on summary adjudication, the Bank was *not* recompensed for insurance costs and therefore the principal amount and interest set forth in the court's summary adjudication order does *not* reflect this or any of the other expenses of handling the collateral.

The next proceedings that took place in the trial court concerned the preparation and entry of final judgments (i.e., the deficiency judgments) for the creditors, and, as we have recited, the court held two hearings in this regard. At the first hearing, appellants' counsel told the trial court, "I think we've narrowed the scope of [the remaining issues] as to [the Bank]. It is only—my client is unsatisfied with one issue, and that has to do with the

29

receiver's fees, $172,000 is a substantial fee. [¶] And I've asked [counsel for the receiver] to produce invoices for that. He's produced a good amount of documents, but he has not produced those underlying invoices. I did represent to [counsel] that we will take the Duane Morris fees, his firm's fees, off the table for purposes of dispute, and we stand by that. [¶] So for [the Bank], that is the only issue that's remaining with respect to the receiver issues." Counsel for the receiver responded the documentation would be provided.

As far as we can tell, there was no discussion at this hearing, or at the second hearing, of expenses for insurance, monitors, security. Rather, the court instructed the parties to make every effort to work out a stipulation with specific numbers so it could prepare and enter final judgments for the creditors, including the Bank, and discharge the receiver. As we have discussed, the parties were able to provide the court with the stipulations it desired. And, as we have further discussed, appellants cannot appeal with respect to any matters embraced by the post-summary adjudication proceedings and the stipulated judgment for the Bank that ensued.

Thus, it appears from the record that the Bank was not awarded the insurance costs appellants purport to challenge on appeal, or if they were, they were resolved by negotiation and the stipulated judgment.

Appellants secondly claim that there is a triable issue as to whether the Bank adequately "mitigated" its damages. The trial court refused to consider this argument since it was not raised in their written opposition to the Bank's summary adjudication motion, and appellants pressed the issue for the first time at the hearing. Although the court spoke in terms of mitigation not having been raised in the "pleadings," it is clear it was referring to the papers filed in opposition to the Bank's motion.

30

Appellants point out that in their answers (i.e., their "pleadings") they did raise failure to mitigate as an affirmative defense. Basically, these defenses were one-sentence, generic assertions, the only elaboration being in Hassanally's answer that the Bank "failed to exercise reasonable care and diligence to avoid loss and to minimize damages." Hassanally also raised as an affirmative defense that the Bank "failed to act in a commercially reasonable manner in the handling and disposition of collateral."

While appellants may have separately pled generic "failure to mitigate" and "commercial unreasonableness" defenses, in the trial court, they seemingly treated the two as fungible, as reflected by the fact they never mentioned failure to mitigate in their opposition to the Bank's motion for summary adjudication. Likewise, at the hearing on the Bank's motion, their counsel provided no explanation, nor asked to make an offer of proof for purposes of appeal, as to how the Bank's asserted failure to mitigate differed from its asserted failure to dispose of the collateral in a commercially reasonable manner.

Similarly, in their opening brief, while appellants maintain the trial court erred in failing to address mitigation, they do not explain how their claim that the Bank failed to mitigate its damages differs in substance from their claim that the Bank failed to dispose of the collateral in a commercially reasonable manner. For example, they quote from *Apex LLC v. Sharing World, Inc.* (2012) 206 Cal.App.4th 999, 1018, to the effect that section 2706 " 'requires that all resales be conducted in a commercially reasonable manner and that sellers act in good faith.' " And they quote from *American National Bank & Trust Co. v. Weyerhaeuser Co.* (7th Cir. 1982) 692 F.2d 455, 468, to the effect that "by imposing the requirements of good faith and commercial reasonableness, the law does in fact require reasonable attempts to mitigate

31

damages." They then refer back to the sections of their brief discussing commercial reasonableness.

In short, while appellants complain they were not allowed to present argument on failure to mitigate, they provide no hint as to what additional point(s) they would have argued, had the trial court entertained such an argument. Accordingly, they have not carried their burden to show any reversible error by the trial court.

## DISPOSITION

The judgment is affirmed. Respondent to recover costs on appeal.

_____

Banke, J.


We concur:


_____

Margulies, Acting P.J.


_____

Devine, J.*


*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A162824, BMO Harris Bank v. Hassanally et al